1  RODGER M. LANDAU (State Bar No. 151456)
   SHARON M. KOPMAN (State Bar No. 164449)
2  LANDAU GOTTFRIED & BERGER LLP
   1801 Century Park East, Suite 1460
3  Los Angeles, California 90067
   Telephone: (310) 557-0050
4  Facsimile: (310) 557-0056
   rlandau@lgbfirm.com
5  skopman@lgbfirm.com

6  Counsel for Debtor and Debtor In Possession
   Harrington West Financial Group, Inc.
7

8
                UNITED STATES BANKRUPTCY COURT
9
           FOR THE CENTRAL DISTRICT OF CALIFORNIA
10
                      NORTHERN DIVISION
11

12 | In re                          | Bk. No. 9:10-bk-14677-RR
13 | HARRINGTON WEST FINANCIAL      | Chapter 11
   | GROUP, INC.,
14 |                                | **DISCLOSURE STATEMENT IN**
   |         Debtor.                | **SUPPORT OF THE DEBTOR'S PLAN OF**
15 |                                | **LIQUIDATION**
16 |                                |
   |                                | **Confirmation Hearing**
17 |                                |
   |                                | Date:    [TO BE SET]
18 |                                | Time:    [TO BE SET]
   |                                | Place:   Courtroom 201
19 |                                |          1415 State Street
20 |                                |          Santa Barbara, CA 93101-2511

21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| PLAN OVERVIEW | 1 |
| Note Regarding Distributions | 3 |
| I. INTRODUCTION | 4 |
| A. 11 U.S.C. § 1125 | 5 |
| B. Voting Class | 5 |
| C. Additional Information | 6 |
| D. Disclaimer | 7 |
| E. Balloting | 8 |
| F. Confirmation Hearing | 8 |
| II. SUMMARY | 9 |
| A. The Debtor | 9 |
| B. Overview of the Plan | 10 |
| C. Recommendation | 10 |
| III. BACKGROUND | 10 |
| A. The Debtor's Business | 10 |
| B. The Debtor's Financing | 11 |
| 1. Secured Indebtedness | 11 |
| 2. Unsecured Indebtedness | 11 |
| 3. Equity Interests | 13 |
| C. Events Leading Up to Bankruptcy | 14 |
| 1. Overall Business Erosion – Declining Real Estate Market and Increasing Unemployment | 14 |
| 2. Regulatory Actions By The OTS | 15 |
| a. OTS Supervisory Agreements | 16 |
| b. August 2009 - OTS Prompt Corrective Action Notice | 16 |
| c. OTS Cease and Desist Orders | 16 |

        d. April 2010 - OTS Prompt Corrective Action .................................................. 17
    3. Capital Raising Efforts Betweeen 2007 and 2010 .......................................... 18
    4. Common Stock Delisting From NASDAQ ....................................................... 20
    5. FDIC's Marketing Of The Bank ....................................................................... 20
 D. Debtor in Possession Administration ......................................................................... 20
    1. Applicaton to Employ Landau Gottfried & Berger LLP as Bankruptcy Counsel ........ 21
    2. Application to Employ Crowe Horwath LLP as Accountants ....................... 21
    3. Bar Date Motion ............................................................................................ 22
    4. Extension of Exclusivity to File Plan and Solicit ............................................ 22
    5. Application to Employ BMC Group, Inc. as Noticing and Solicitation Agent ........... 22
    6. Schedules and Statement of Financial Affairs ............................................... 23
    7. Tax Audit and Refunds .................................................................................. 23
    8. Insurance Refunds ......................................................................................... 23
    9. FDIC Proof of Claim ...................................................................................... 23
 E. Prosecution of Estate Causes of Action ..................................................................... 24
    1. Estate Causes of Action Against Third Parties ............................................. 24
    2. Recovery of Preferential or Fraudulent Transfers ......................................... 25
    3. Objections to Claims ..................................................................................... 25
IV. THE PLAN OF LIQUIDATION .................................................................................... 25
 A. Summary of Certain Other Provisions of the Plan ..................................................... 28
    1. Deadline for Filing Certain Administrative Tax Claims. ................................ 28
    2. Executory Contracts and Unexpired Leases. ................................................ 28
    3. Means of Implentation of the Plan ................................................................ 29
        a. From the Confirmation Date to the Effective Date ................................ 29
        b. Establishment of the Liquidating Trust .................................................. 30
        c. Vesting and Transfer of Debtor's Assets ................................................ 30
        d. Implementation of the Liquidating Trust ............................................... 30
            i. Representative of the Estate ............................................................ 31

```
                        ii.  No Liability of Liquidating Trustee ................................................. 31
                       iii.  Prosecution of Estate Causes of Action by the Liquidating Trustee ... 32
             e.  Issuance and Execution of Plan Related Documents and Corporate Action .... 33
             f.  Cancellation/Surrender of Debentures and Related Agreements. .................... 33
        4.  Resolution of Disputed Claims ................................................................ 35
        5.  Distributions Under the Plan .................................................................. 35
             a.  General Provisions. ......................................................................... 35
             b.  Delivery of Distributions, Address of Holder ................................. 36
             c.  Record Date .................................................................................. 36
        6.  Conditions Precedent ............................................................................. 37
        7.  Retention of Jurisdiction ......................................................................... 37
        8.  Effective Date ........................................................................................ 37
        9.  Amendment, Modification or Revocation of the Plan ............................. 37
       10.  Post Confirmation Notice ...................................................................... 38
V.  EFFECT OF PLAN CONFIRMATION ................................................................. 38
   A. Preservation of Rights of Action ..................................................................... 38
   B. No Liability for Solicitiation or Participation .................................................. 38
VI. CONFIRMATION PROCEDURE ........................................................................ 39
   A. Voting; Acceptance ......................................................................................... 39
   B. Confirmation Hearing ..................................................................................... 40
   C. Feasibility ....................................................................................................... 43
   D. Best Interests Test .......................................................................................... 43
   E. Risks ............................................................................................................... 44
VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF
     REORGANIZATION .......................................................................................... 44
   A. Liquidation Under Chapter 7 .......................................................................... 44
   B. Alternative Plan of Liquidation ...................................................................... 45
VIII. VOTING PROCEDURES ................................................................................... 45
```

A. Procedures for Tabulation of Votes on the Plan .................................................................. 45

B. Special Provisions With Respect to Voting Indenture Trustee Claims ............................. 48

IX. CERTAIN FEDERAL INCOME TAX CONSQUENCES ....................................................... 48

A. Introduction ........................................................................................................................ 48

B. Consequences to the Debtor .............................................................................................. 50

C. Consequences to Holders of Allowed Claims in Classes 3 and 4 ..................................... 50

   1. Recognition of Gain or Loss Generally ........................................................................ 50

   2. Distributions in Payments of Accrued but Unpaid Interest .......................................... 52

   3. Tax Treatment of the Liquidating Trust and Holders of Interests Therein .................. 53

   4. Tax Reporting ............................................................................................................... 55

   5. Witholding .................................................................................................................... 57

X. FEES AND EXPENSES ............................................................................................................ 57

XI. SUMMARY OF ADDITIONAL SOURCES OF INFORMATION ....................................... 58

XII. RECOMMENDATION AND CONCLUSION ...................................................................... 59

## PLAN OVERVIEW

The Plan[1] provides for the disposition of all Assets of the Debtor's Estate through the establishment of a Liquidating Trust for the benefit of the Holders of Allowed Claims consistent with the priority provisions of the Bankruptcy Code and the Plan. Assets, to the extent not converted to Cash or other proceeds as of the Effective Date, will be sold or otherwise disposed of by the Liquidating Trustee after the Effective Date, with all net Available Cash proceeds to be distributed to Holders of Allowed Claims, as provided for in the Plan.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1] Capitalized terms used in this Disclosure Statement shall, unless otherwise indicated, bear the meaning ascribed to them in the Plan of Liquidation, attached as Exhibit "A" ("Plan").

1

| | Plan Summary | | | | |
|---|---|---|---|---|---|
| | Class | Treatment | Property Distributed | Recovery (approx.) | Voting Status |
| 1 | **Class 1**: Other Priority Claims. **Class 1** will include any Allowed Claim of the Federal Deposit Insurance Corporation to the extent deemed to be a priority claim pursuant to 11 U.S.C. § 507(a)(9) and/or other applicable authority. *See* FDIC Proof of Claim, Exhibit "G" hereto.<br><br>The FDIC claim presently is unliquidated. To the extent that it becomes an Allowed Class 1 Claim it will reduce, and (if large enough) may eliminate, the amounts available for distribution to unsecured creditors in Class 3.<br><br>The Debtor disputes the FDIC's claim and reserves all rights with respect thereto. | Payment in Cash in full in accordance with the priorities set forth in section 507(a) of the Bankruptcy Code. | Cash | 100% of Allowed Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| 2 | **Class 2**: Secured Claims | Retention of all legal, equitable and contractual rights | Cash and/or Property | 100% of Allowed Secured Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| 3 | **Class 3**: General Unsecured Claims | Pro Rata distribution of Available Cash in the Liquidating Trust | Cash | | Impaired - entitled to vote |

| Plan Summary | | | | |
|---|---|---|---|---|
| Class | Treatment | Property Distributed | Recovery (approx.) | Voting Status |
| **Class 4**: Indenture Trustee Claims | Each Holder of an Allowed Class 4 Claim shall be allocated a Pro Rata share of each Distribution available to Holders of Allowed Class 3 Claims; <u>provided, however</u>, that the amount of distributions to Holders of Allowed Class 4 Claims shall first be paid on account of unpaid Indenture Trustee Fees accrued prior to the Petition Date, in an estimated amount of $595. | Cash | | Impaired - entitled to vote |
| **Class 5:** HWFG Preferred Stock Interests | Receives no distribution under the Plan unless and until Class 4 is paid in full; cancelled pursuant to the Plan | N/A | N/A | Impaired – not entitled to vote (deemed to reject) |
| **Class 6:** HWFG Common Stock Interests | Receives no distribution under the Plan unless and until Class 5 is paid in full; cancelled pursuant to the Plan | N/A | N/A | Impaired – not entitled to vote (deemed to reject) |

**<u>Note Regarding Distributions</u>:**

Distributions to holders of Administrative Expenses and Priority Tax Claims and Holders of Claims in Classes 1 and 2 are anticipated to be made on the later of: (i) the Effective Date, or as soon as practicable thereafter; and (ii) as soon as practicable after the date the Claim becomes an Allowed Claim. On March 9, 2011, the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver for Los Padres Bank, FSB, filed its Proof of Claim in the Debtor's Chapter 11 Case (the "<u>FDIC POC</u>"). As filed, the FDIC POC is for an unliquidated amount and alleges both

unsecured and priority claims pursuant to 11 U.S.C. § 507(a)(9) and/or other applicable authority. A copy of the FDIC POC is attached hereto as Exhibit "G".

TO THE EXTENT THAT THE FDIC POC BECOMES AN ALLOWED CLAIM ENTITLED TO PRIORITY TREATMENT, IT WILL BE CLASSIFIED AS A CLASS 1 CLAIM. DISTRIBUTIONS MADE ON ACCOUNT OF ANY ALLOWED CLASS 1 CLAIM OF THE FDIC SHALL BE IN ACCORDANCE WITH THE PRIORITY OF SUCH ALLOWED CLAIM UNDER 11 U.S.C. § 507(a)(9) AND/OR OTHER APPLICABLE LAW. ANY SUCH ALLOWED CLASS 1 CLAIM OF THE FDIC WILL REDUCE, AND MAY COMPLETELY ELIMINATE, THE AMOUNTS AVAILABLE FOR DISTRIBUTION TO GENERAL UNSECURED CREDITORS OF THE DEBTOR. THE DEBTOR DISPUTES THE FDIC'S CLAIM. THE RIGHTS OF THE DEBTOR AND THE LIQUIDATING TRUSTEE, ON BEHALF OF THE LIQUIDATING TRUST, WITH RESPECT TO THE FDIC'S CLAIM ARE, IN ALL RESPECTS AND IN THEIR ENTIRETY, EXPRESSLY RESERVED.

Distributions to Holders of Allowed Class 3 Claims and Allowed Class 4 Claims will be conducted as soon as practicable after the Effective Date in the discretion of the Liquidating Trustee, provided, however, that distributions could be delayed by reason of: (a) claims filed after the Effective Date (including claims arising from rejection of executory contracts and unexpired leases); (b) Disputed Claims (including Disputed Claims that are not liquidated); and (c) the Liquidating Trustee's evaluation of the Available Cash.

I.    **INTRODUCTION**

HWFG filed a voluntary petition for relief (the "Petition") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (the "Bankruptcy Code"), on September 10, 2010 (the "Petition Date"), thereby commencing the above-captioned Chapter 11 Case. HWFG has operated as a debtor in possession since the Petition Date pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or Official Committee of Creditors Holding Unsecured Claims has been appointed in the Chapter 11 Case. The Debtor filed its Plan on March 24, 2011 (Docket No. 51). The Plan envisions a liquidation of all HWFG's remaining non-Cash Assets pursuant to the provisions of the Bankruptcy Code and in accordance with the terms of the Plan.

### A.    11 U.S.C. § 1125.

This *Disclosure Statement in Support of the Debtor's Plan of Liquidation* (as the same may be modified, amended, or supplemented, the "<u>Disclosure Statement</u>") is submitted pursuant to section 1125 of the Bankruptcy Code to holders of impaired Claims in connection with the proceedings seeking confirmation of the Plan. A copy of the Plan is attached hereto as <u>Exhibit A</u>". This Disclosure Statement sets forth information regarding, among other things, the history of HWFG and its business, the filing of the Petition and the Plan, and alternatives thereto. Its purpose is to provide the holders of impaired Claims adequate information to assist them in making an informed decision regarding acceptance or rejection of the Plan. Each holder of an impaired Claim should read this Disclosure Statement (including its exhibits) and the Plan (including its exhibits) in their entirety and consider them with such holder's legal and financial advisors in connection with the proceedings seeking confirmation of the Plan. No person has been authorized by HWFG to utilize, for purposes of solicitation, any information concerning HWFG or its business, other than the information contained or referred to herein.

### B.    Voting Class.

Pursuant to the Bankruptcy Code, each holder of an Allowed Class 3 Claim and Allowed Class 4 Claim (the "<u>Voting Classes</u>"), is entitled to vote on the Plan. Holders of Allowed Claims in Classes 1 and 2 are presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code because their Claims are not impaired under the Plan. Holders of Equity Interests in Classes 5 and 6 are presumed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code because they will not receive a distribution under the Plan. For a description of the Classes of Claims and Equity Interests and their treatment under the Plan, see Section II of the Plan entitled *"Classification and Treatment of Claims and Equity Interests."*

Except as described below, the Plan may be confirmed only if accepted by the Voting Classes. The Bankruptcy Code defines "acceptance" with respect to a class of impaired Claims, as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such class counting only those Holders who cast ballots.

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF CLASS 3 CLAIMS AND CLASS 4 CLAIMS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS. THE DEBTOR THEREFORE RECOMMENDS THAT HOLDERS OF CLASS 3 CLAIMS AND CLASS 4 CLAIMS VOTE TO ACCEPT THE PLAN.**

The Debtor anticipates that Holders of Class 3 Claims and Class 4 Claims will vote to accept the Plan. The Debtor reserves the right to modify the Plan in accordance with section 1127(a) of the Bankruptcy Code.

For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation notwithstanding rejection by certain classes, see Section VI of this Disclosure Statement entitled *"Confirmation Procedure."*

**C.    Additional Information.**

Attached as exhibits to this Disclosure Statement are copies of the following:

1.  The Plan (Exhibit "A");
2.  Projected Available Cash Proceeds Analysis (Exhibit "B");
3.  Hypothetical Chapter 7 Liquidation Analysis (Exhibit "C");
4.  List of Pending Litigation (Exhibit "D");
5.  Potential Preference Payments (Exhibit "E");
6.  Potential Third Party Estate Causes of Action (Exhibit "F"); and
7.  The FDIC POC (Exhibit "G").

Also accompanying this Disclosure Statement and its attendant exhibits, including the Plan, are copies of the following: (i) the Notice of the Order of the Bankruptcy Court approving this Disclosure Statement, and scheduling the Confirmation Hearing, the deadlines and procedures for voting and for objecting to confirmation of the Plan, and related matters (the "Confirmation Hearing Notice"); and (ii) for each Holder of Claims in the Voting Classes (Class 3 and Class 4), the form of ballot for casting an acceptance or rejection of the Plan.

///

///

**D.    Disclaimer.**

The Bankruptcy Court has approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of its books and records, to enable hypothetical, reasonable investors typical of the Holders of impaired Claims in the Voting Classes to make an informed judgment as to whether to accept or reject the Plan.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR BY ANY STATE AUTHORITY UNDER ANY STATE SECURITIES OR "BLUE SKY" LAW, NOR HAS THE COMMISSION (OR ANY STATE AUTHORITY) PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.**

**THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE AT THE TIMES MADE, TO THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF. HOWEVER, NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION AGAINST THE DEBTOR OR ITS ESTATE.**

**EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, NOTHING CONTAINED HEREIN SHALL BE ATTRIBUTABLE TO OR IS DERIVED FROM OR REPRESENTED TO BE ACCURATE BY THE DEBTOR OR BY ANY OF ITS ADVISORS. NOR HAS THE DEBTOR OR ANY SUCH ADVISOR INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN.**

ALTHOUGH THE DEBTOR'S PROFESSIONAL ADVISORS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THEY HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.

After carefully reviewing this Disclosure Statement and the Plan, including the respective exhibits, each Holder of an impaired Claim in the Voting Classes (Class 3 and Class 4) should decide whether to accept or reject the Plan and should indicate its vote on the enclosed Ballot and return it in the envelope provided.

E.    **Balloting.**

TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN, SIGNED, AND TRANSMITTED IN THE MANNER SPECIFIED IN THE BALLOT SO THAT IT IS RECEIVED BY THE VOTING DEADLINE SPECIFIED IN THE BALLOT. PLEASE CAREFULLY FOLLOW ALL INSTRUCTIONS CONTAINED IN THE BALLOT. ANY BALLOTS RECEIVED WHICH DO NOT FULLY COMPLY WITH THE BALLOT INSTRUCTIONS WILL NOT BE COUNTED. BALLOTS WHICH INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, OR WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, WILL NOT BE COUNTED.

If you have any questions about the procedure for voting, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of this Disclosure Statement, please contact the Debtor's Ballot tabulator, Patricia Swierszcz ("Ballot Tabulator"), in writing, and send to 1801 Century Park East, Suite 1460, Los Angeles, California, 90067, Facsimile: (310) 557-0056.

F.    **Confirmation Hearing.**

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan (the "Confirmation Hearing") on the date and at the place specified in the Confirmation Hearing Notice

accompanying this Disclosure Statement. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before the date specified, and in the manner described, in the Confirmation Hearing Notice. The Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing or at any subsequent continued Confirmation Hearing.

## II. SUMMARY

The following is a summary of certain information contained elsewhere in this Disclosure Statement. Reference is made to, and this Summary is qualified in its entirety by reference to, the more detailed information contained herein and in the exhibits hereto. Holders of impaired Claims are urged to read this Disclosure Statement, the Plan and their respective exhibits in their entirety.

### A. The Debtor.

The Debtor is a savings and loan holding company that was incorporated in Delaware in 1995, and commenced operations after it was registered as a thrift holding company in April 1996. Upon its registration as a bank holding company, the Debtor acquired all of the issued and outstanding securities of Los Padres Bank, FSB (the "Bank"). The Debtor was formed as a savings and loan holding company to provide additional flexibility to the organization through the ability to serve a broader geographic area, expand its product offerings, access capital markets through the ability to issue debt and other financial instruments, and to gain certain tax benefits. Its principal business was to serve as the holding company for its wholly-owned subsidiary and principal asset, the Bank. As of August 1, 2010, the Bank had eleven (11) full-service banking branches located in the Central Coast of California and three (3) full service banking branches in the Phoenix metropolitan area in Arizona. The Bank engaged in single family, multi-family and commercial lending primarily in its direct market areas.

As a savings and loan holding company, the Debtor was subject to regulation by the Office of Thrift Supervision ("OTS"). The Bank's deposits were insured through the Deposit Insurance Fund of the FDIC, and the Bank was subject to regulation by the FDIC.

//

**B.    Overview of the Plan.**

THE FOLLOWING OVERVIEW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED HERETO AS <u>EXHIBIT "A"</u>.  IN THE EVENT OF ANY INCONSISTENCY, THE PLAN WILL CONTROL.

The Plan provides for the liquidation of substantially all of the non-Cash Assets of the Debtor and the distribution of the Available Cash to Holders of Allowed Claims, consistent with the priority provisions of the Bankruptcy Code, and in accordance with the Plan.  The Plan does not provide for any distribution to holders of Allowed Equity Interests unless and until Holders of Allowed Class 4 Claims have been paid in full, which -- as set forth in the projections attached as <u>Exhibit "B"</u> hereto-- is not projected to occur.

**C.    Recommendation.**

The Debtor believes that the Plan provides the best feasible recoveries to Holders of Allowed Class 3 Claims and Allowed Class 4 Claims and is in the best interests of such Holders. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT ALL SUCH HOLDERS ACCEPT THE PLAN.

**III.    BACKGROUND**

As more fully described below, the Plan provides that all Assets of the Estate remaining on the Effective Date will vest in the Liquidating Trust.  The Available Cash will be distributed to the Debtor's creditors by the Liquidating Trustee in accordance with applicable provisions of the Bankruptcy Code and in accordance with the Plan, and the Liquidating Trustee will be appointed to, among other things, handle prosecution and recovery of any and all Estate Causes of Action that may bring Cash into the Liquidating Trust, and sell any other Assets that may have value, bring any potential avoidance actions, and object to any claims.

**A.    The Debtor's Business.**

On August 20, 2010, the OTS closed the Debtor's wholly-owned subsidiary and primary Asset, the Bank, and the FDIC was appointed as a receiver for the assets and liabilities of the Bank. Upon its appointment as receiver for the Bank, the FDIC entered into a purchase and assumption

agreement with Pacific Western Bank to assume all of the Bank's deposits and certain other of its assets and liabilities.

As reflected in Section II.A. above, prior to the Bank's closure, the Debtor's primary business was to serve as a holding company for the Bank. Other than the business conducted by the Bank, on the Petition Date, the Debtor did not own or engage in any other operating businesses. As a legal entity separate and distinct from its subsidiary Bank, the Debtor's principal source of funds was dividends that were paid by the Bank and financing obtained by the Debtor as discussed below.

As a result of the loss of its primary financial Asset, the Debtor commenced this Chapter 11 Case by filing a Petition on the Petition Date.

**B.  The Debtor's Financing.**

**1.  Secured Indebtedness.**

The Debtor has no secured indebtedness.

**2.  Unsecured Indebtedness.**

The bulk of Debtor's unsecured indebtedness consists of the Indenture Trustee Claim classified in Class 4 of the Plan, which is based on the following:

(a)  Between September 2003 and September 2004, the Debtor raised approximately $25.8 million of capital through two (2) statutory business trusts ("Statutory Business Trusts") that were established in approximately September 2003 and September 2004 respectively. The Debtor sponsored the Statutory Business Trusts for the purpose of selling and administering trust originated preferred securities ("TRUPs"). The Debtor guaranteed certain performance obligations of the Statutory Business Trusts (as distinguished from payment obligations) pursuant to the Guarantee Agreements. The Statutory Business Trusts sold the TRUPs to investors and then used the proceeds of the sale of the TRUPs to purchase from the Debtor junior subordinated deferrable interest Debentures pursuant to two Indentures: (i) the Indenture dated as of September 25, 2003 by and between the Debtor and Wilmington Trust Company as indenture trustee thereunder ("Wilmington Trust") in the total principal amount of $15,464,000 due 2033 and (ii) the Indenture dated as of September 27, 2004 by and between the Debtor and Wells

Fargo Bank, National Association ("Wells Fargo") in the total principal amount of $10,310,000 due 2034 (Wells Fargo and Wilmington Trust collectively referred to as the "Indenture Trustees" when acting in that capacity). The total aggregate amount owing under the two Indentures as of the Petition Date is $25,774,000 in original principal *plus* (b) approximately $1,300,000 in accrued but unpaid interest as of the Petition Date.[2]

       The sole assets of the Statutory Business Trusts are the Debentures issued by the Debtor and the sole obligations of each Statutory Business Trust relate to the TRUPs it issued (other than the payment of fees, expenses, and other amounts to the trustees of the respective Statutory Business Trusts). As a result, the Statutory Business Trusts are essentially conduits, or pass through entities, organized for the primary purpose of paying amounts received on the Debentures to the holders of the TRUPs. The Debentures are governed by the Indentures and the Statutory Business Trusts are governed by the Declaration of Trusts. One institution typically serves as the trustee under both the Indentures (the Indenture Trustees) and the Declaration of Trusts ("TRUP Trustees"). In this case Wells Fargo and Wilmington Trust are both the Indenture Trustees and the TRUP Trustees.

       The Declaration of Trusts provide that upon an event of default, including the filing of a chapter 11 case by the Debtor, the TRUP Trustees are to distribute the Debentures directly to the holders of the TRUPs, thereby entitling them to directly exercise the right to authorize, consent to, and take other actions with respect to the Debentures. To date, the TRUP Trustees have not distributed the Debentures to the holders of the TRUPs.[3] Furthermore, the Indentures provide that the Indenture Trustees are not authorized to accept or adopt any chapter 11 plan on behalf of the holders of the TRUPs.[4] Due to the single purpose, pass-through nature of the Statutory Business Trusts and the clear instruction of the Indentures and the Declaration of Trusts that holders of the

---

[2] The cash raised was typically down-streamed by the Debtor to the Bank to provide adequate capital to support the Bank's strategic plan initiatives, fulfilling regulatory capital requirements, and providing capital and liquidity for general operating purposes.

[3] The Declaration of Trusts provide that the TRUP Trustees are not required to distribute the Debentures if doing so would be impractical.

[4] Section 5.02 states "Nothing herein contained shall be construed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Security holder any plan of organization, arrangement, adjustment or composition affecting the [Debentures] or the rights of any holder thereof or to authorize the Trustee to vote in respect of the claim of any Security holder in any such proceeding..

TRUPs have the right to receive a distribution on account of the Debentures and exercise ownership and voting rights associated with the Debentures, only the holders of the TRUPs are entitled to vote on the Plan directly.[5]

The balance of other unsecured indebtedness includes franchise taxes owed to the State of Delaware (the jurisdiction of Debtor's incorporation), unliquidated intercompany claims that may be held by the Bank, unliquidated claims for pre-petition professional services rendered and other vendor claims in Class 3 of the Plan.

### 3.    Equity Interests.

There are two types of equity, HWFG Preferred Stock Interests and HWFG Common Stock Interests.

(a)    <u>HWFG Preferred Stock Interests</u> – In or about September 2008, the Debtor raised approximately $3,301,000 through the issuance of the HWFG Preferred Stock Interests. As of the Petition Date, 57,000 shares of HWFG Preferred Stock Interests were issued and outstanding. The HWFG Preferred Stock Interests are privately held. The HWFG Preferred Stock Interests rank senior to the HWFG Common Stock Interests and as such have rights, preferences and privileges which are superior to the HWFG Common Stock Interests, including, dividend and liquidation preferences.[6]

The Holders of Preferred Stock Interests are not receiving any distribution under the Plan and therefore are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

(b)    <u>HWFG Common Stock Interests</u> - As of the Petition Date, the Debtor had 7,364,089 shares of HWFG Common Stock Interests issued and outstanding. Except as otherwise provided under the law, the HWFG Common Stock Interests have no special rights, preferences or privileges. In liquidation, if there are any assets remaining of the Debtor legally available for distribution to stockholders after payment or provision for payment of all debts and

---

[5]    *See* 11 U.S.C. § 1126 (providing that a "holder of a claim of interest allowed under section 502 of this title may accept or reject a plan.")(emphasis added); *see also* 11 U.S.C. § 101(5)(A)(defining a claim as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured or unsecured. . . . .")(emphasis added).

[6]    The HWFG Preferred Stock Interests could be converted to common shares at the option of the Holder of HWFG Preferred Stock Interests.

liabilities of the Debtor, the order of priority is: (a) the Holders of the HWFG Preferred Stock Interests to the extent of their liquidation preference; and (b) all remaining assets are distributed to the Holders of HWFG Common Stock Interests. The HWFG Common Stock Interests were publicly traded until such stock was delisted from the NASDAQ stock exchange as set forth below. Currently, the HWFG Common Stock Interests are traded in the over-the-counter market on the Pink Sheets under the symbol "HWFG."

The Holders of HWFG Common Stock Interests are not receiving any distribution under the Plan and therefore are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### C. Events Leading Up to Bankruptcy.

#### 1. Overall Business Erosion - Declining Real Estate Market and Increasing Unemployment.

Prior to 2009, the principal business of the Bank was attracting checking and savings deposits from the general public and using those deposits, together with borrowings and other funds, to make real estate, business and consumer loans and invest in certain residential mortgage backed securities ("RMBS").

Beginning in late 2007, the residential real estate markets in the Bank's principal markets of Arizona and California started to decline in value and defaults on mortgage loans began to rise. The availability of mortgage credit through RMBS started to decline precipitously as the underlying liquidity and demand for the RMBS decreased due to rising defaults and losses. This caused increased strain in the residential housing market, which in turn caused further decline in the value of the residential real estate.

Although the Bank had a diversified portfolio of loans across residential and commercial properties and a non-mortgage loan portfolio of commercial and industrial loans, the broad decline in real estate values caused loan delinquencies to rise, especially on its residential construction and later commercial real estate construction loans. These construction loans were dependent on sales of the underlying collateral or borrower funds for interest and principal payments on the loans. With the rapidly falling real estate values, a lack of buyers, and constrained financing sources, the