RODGER M. LANDAU (State Bar No. 151456)
SHARON M. KOPMAN (State Bar No. 164449)
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 1460
Los Angeles, California 90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056
rlandau@lgbfirm.com
skopman@lgbfirm.com

Counsel for Debtor and Debtor In Possession
Harrington West Financial Group, Inc.

# UNITED STATES BANKRUPTCY COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### NORTHERN DIVISION

|  |  |
|---|---|
| In re<br><br>HARRINGTON WEST FINANCIAL GROUP, INC.,<br><br>      Debtor. | Bk. No. 9:10-bk-14677-RR<br><br>Chapter 11<br><br>**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTOR'S FIRST AMENDED PLAN OF LIQUIDATION**<br><br>**<u>Confirmation Hearing</u>**<br><br>**Date:**    September 14, 2011<br>**Time:**   11:00 a.m.<br>**Place:**  Courtroom 201<br>         1415 State Street<br>         Santa Barbara, CA 93101-2511 |

# TABLE OF CONTENTS

**Page**

PLAN OVERVIEW ........................................................................................................... 1

   Note Regarding Distributions ...................................................................................... 3

I. INTRODUCTION ......................................................................................................... 4

   A.  11 U.S.C. § 1125. .................................................................................................. 5

   B.  Voting Class. ........................................................................................................ 5

   C.  Additional Information. ........................................................................................ 6

   D. Disclaimer. ............................................................................................................ 7

   E. Balloting ............................................................................................................... 8

   F. Confirmation Hearing .......................................................................................... 9

II. SUMMARY ................................................................................................................. 9

   A. The Debtor. ........................................................................................................... 9

   B. Overview of the Plan .......................................................................................... 10

   C. Recommendation ................................................................................................ 10

III. BACKGROUND ...................................................................................................... 10

   A. The Debtor's Business. ....................................................................................... 11

   B. The Debtor's Financing ...................................................................................... 11

      1. Secured Indebtedness ..................................................................................... 11

      2. Unsecured Indebtedness ................................................................................. 11

      3. Equity Interests .............................................................................................. 13

   C.  Events Leading Up to Bankruptcy. .................................................................... 14

      1.  Overall Business Erosion – Declining Real Estate Market and Increasing
         Unemployment .............................................................................................. 14

      2. Regulatory Actions By The OTS .................................................................. 16

         a. OTS Supervisory Agreements .................................................................. 16

         b. August 2009 - OTS Prompt Corrective Action Notice ............................ 16

         c. OTS Cease and Desist Orders .................................................................. 17

d. April 2010 - OTS Prompt Corrective Action ................................................. 17

3. Capital Raising Efforts Betweeen 2007 and 2010 .................................... 18

4. Common Stock Delisting From NASDAQ .............................................. 20

5. FDIC's Marketing Of The Bank ........................................................... 20

D. Debtor in Possession Administration ...................................................... 21

1. Applicaton to Employ Landau Gottfried & Berger LLP as Bankruptcy Counsel. ...... 21

2. Application to Employ Crowe Horwath LLP as Accountants ........................ 21

3. Bar Date Motion ............................................................................ 22

4. Extension of Exclusivity to File Plan and Solicit ..................................... 23

5. Application to Employ BMC Group, Inc. as Noticing and Solicitation Agent. ........... 23

6. Schedules and Statement of Financial Affairs ........................................ 23

7. Tax Audit and IRS Refunds ............................................................... 23

8. Insurance Refunds ........................................................................ 24

9. FDIC Proof of Claim ....................................................................... 24

E. Prosecution of Estate Causes of Action ................................................... 25

1. Estate Causes of Action Against Third Parties ....................................... 25

2. Recovery of Preferential or Fraudulent Transfers ................................... 25

3. Objections to Claims ...................................................................... 26

IV. THE FIRST AMENDED PLAN OF LIQUIDATION ......................................... 26

A. Summary of Certain Other Provisions of the Plan ...................................... 29

1. Deadline for Filing Certain Administrative Tax Claims. ............................. 29

2. Executory Contracts and Unexpired Leases ........................................... 29

3. Means of Implentation of the Plan ..................................................... 31

a. From the Confirmation Date to the Effective Date ........................... 31

b. Establishment of the Liquidating Trust .......................................... 31

c. Vesting and Transfer of Debtor's Assets ....................................... 31

d. Implementation of the Liquidating Trust ........................................ 32

i. Representative of the Estate ................................................ 32

ii. No Liability of Liquidating Trustee ................................................ 33

iii. Prosecution of Estate Causes of Action by the Liquidating Trustee .. 33

e. Issuance and Execution of Plan Related Documents and Corporate Action.... 34

f. Cancellation/Surrender of Debentures and Related Agreements..................... 35

4. Resolution of Disputed Claims ................................................................ 36

5. Distributions Under the Plan .................................................................... 37

a. General Provisions.................................................................... 37

b. Delivery of Distributions, Address of Holder ................................ 37

c. Record Date ............................................................................ 38

6. Conditions Precedent................................................................................ 38

7. Retention of Jurisdiction .......................................................................... 38

8. Effective Date........................................................................................... 39

9. Amendment, Modification or Revocation of the Plan ............................. 39

10. Post Confirmation Notice ....................................................................... 39

V. EFFECT OF PLAN CONFIRMATION ............................................................. 39

A. Preservation of Rights of Action ................................................................. 39

B. No Liability for Solicitiation or Participation ............................................. 40

VI. CONFIRMATION PROCEDURE ...................................................................... 40

A. Voting; Acceptance...................................................................................... 41

B. Confirmation Hearing .................................................................................. 42

C. Feasibility..................................................................................................... 44

D. Best Interests Test ........................................................................................ 45

E. Risks ............................................................................................................. 45

VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF
LIQUIDATION............................................................................................... 46

A. Liquidation Under Chapter 7 ....................................................................... 46

B. Alternative Plan of Liquidation.................................................................... 46

VIII. VOTING PROCEDURES..................................................................................... 47

    A. Procedures for Tabulation of Votes on the Plan ................................................. 47

    B. Special Provisions With Respect to Voting Class 4 Claims ............................... 49

IX. CERTAIN FEDERAL INCOME TAX CONSQUENCES ................................................. 50

    A. Introduction ..................................................................................................... 50

    B. Consequences to the Debtor ............................................................................ 51

    C. Consequences to Holders of Allowed Claims in Classes 3 and 4 ...................... 52

        1. Recognition of Gain or Loss Generally ...................................................... 52

        2. Distributions in Payments of Accrued but Unpaid Interest ........................... 54

        3. Tax Treatment of the Liquidating Trust and Holders of Interests Therein ................. 54

        4. Tax Reporting .......................................................................................... 57

        5. Witholding ............................................................................................... 58

X. FEES AND EXPENSES ............................................................................................. 59

XI. SUMMARY OF ADDITIONAL SOURCES OF INFORMATION ....................................... 59

XII. RECOMMENDATION AND CONCLUSION ............................................................... 60

## PLAN OVERVIEW

The Plan[1] provides for the disposition of all Assets of the Debtor's Estate through the establishment of a Liquidating Trust for the benefit of the Holders of Allowed Claims consistent with the priority provisions of the Bankruptcy Code and the Plan.  Assets, to the extent not converted to Cash or other proceeds as of the Effective Date, will be sold or otherwise disposed of by the Liquidating Trustee after the Effective Date, with all net Available Cash proceeds to be distributed to Holders of Allowed Claims, as provided for in the Plan.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1] Capitalized terms used in this Disclosure Statement shall, unless otherwise indicated, bear the meaning ascribed to them in the First Amended Plan of Liquidation, attached as Exhibit "A" ("<u>Plan</u>").

| Plan Summary | | | | |
|---|---|---|---|---|
| **Class** | **Treatment** | **Property Distributed** | **Recovery (approx.)** | **Voting Status** |
| **Class 1:** Other Priority Claims. **Class 1** will include any Allowed Claim of the Federal Deposit Insurance Corporation to the extent deemed to be a priority claim pursuant to 11 U.S.C. § 507(a)(9) and/or other applicable authority. *See* FDIC Proof of Claim, <u>Exhibit "G"</u> hereto. <br><br> The FDIC claim presently is unliquidated. To the extent that any of it becomes an Allowed Class 1 Claim it will reduce, and (if large enough) may eliminate, the amounts available for distribution to unsecured creditors in Classes 3 and 4. <br><br> The Debtor disputes the FDIC's claim and reserves all rights with respect thereto. | Payment in Cash in full in accordance with the priorities set forth in section 507(a) of the Bankruptcy Code. | Cash | 100% of Allowed Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| **Class 2:** Secured Claims | Retention of all legal, equitable and contractual rights. | Cash and/or Property | 100% of Allowed Secured Claim | Unimpaired - **not** entitled to vote (deemed to accept) |
| **Class 3:** General Unsecured Claims | Pro Rata distribution of Available Cash in the Liquidating Trust. | Cash | | Impaired - entitled to vote |

2

| Plan Summary | | | | |
|---|---|---|---|---|
| **Class** | **Treatment** | **Property Distributed** | **Recovery (approx.)** | **Voting Status** |
| **Class 4:** Indenture Trustee Claims | Each Holder of an Allowed Class 4 Claim shall be allocated a Pro Rata share of each Distribution available to Holders of Allowed Class 3 Claims; provided, however, that the amount of distributions to Holders of Allowed Class 4 Claims shall first be paid on account of unpaid Indenture Trustee Fees accrued prior to the Petition Date, in an estimated amount of $595. See section IV of this Disclosure Statement for additional detail. | Cash | | Impaired - entitled to vote |
| **Class 5:** HWFG Preferred Stock Interests | Receives no distribution under the Plan unless and until Class 4 is paid in full; cancelled pursuant to the Plan. | N/A | N/A | Impaired – **not** entitled to vote (deemed to reject) |
| **Class 6:** HWFG Common Stock Interests | Receives no distribution under the Plan unless and until Class 5 is paid in full; cancelled pursuant to the Plan. | N/A | N/A | Impaired – **not** entitled to vote (deemed to reject) |

**<u>Note Regarding Distributions</u>:**

Distributions to holders of Administrative Expenses and Priority Tax Claims and Holders of Claims in Classes 1 and 2 are anticipated to be made on the later of: (i) the Effective Date, or as soon as practicable thereafter; and (ii) as soon as practicable after the date the Claim becomes an Allowed Claim. On March 9, 2011, the Federal Deposit Insurance Corporation ("<u>FDIC</u>"), in its capacity as receiver for Los Padres Bank, FSB, filed its Proof of Claim in the Debtor's Chapter 11 Case (the "<u>FDIC POC</u>"). As filed, the FDIC POC is for an unliquidated amount and alleges both

3

unsecured and priority claims pursuant to 11 U.S.C. § 507(a)(9) and/or other applicable authority.

A copy of the FDIC POC is attached hereto as <u>Exhibit "G"</u>.

      TO THE EXTENT THAT THE FDIC POC OR ANY PORTION THEREOF BECOMES AN ALLOWED CLAIM ENTITLED TO PRIORITY TREATMENT, IT WILL BE CLASSIFIED AS A CLASS 1 CLAIM. DISTRIBUTIONS MADE ON ACCOUNT OF ANY ALLOWED CLASS 1 CLAIM OF THE FDIC SHALL BE IN ACCORDANCE WITH THE PRIORITY OF SUCH ALLOWED CLAIM UNDER 11 U.S.C. § 507(a)(9) AND/OR OTHER APPLICABLE LAW. ANY SUCH ALLOWED CLASS 1 CLAIM OF THE FDIC WILL REDUCE, AND MAY COMPLETELY ELIMINATE, THE AMOUNTS AVAILABLE FOR DISTRIBUTION TO UNSECURED CREDITORS HOLDING ALLOWED CLAIMS IN CLASSES 3 AND 4. THE DEBTOR DISPUTES THE FDIC POC. THE RIGHTS OF THE DEBTOR AND THE LIQUIDATING TRUSTEE, ON BEHALF OF THE LIQUIDATING TRUST, WITH RESPECT TO THE FDIC'S CLAIM ARE, IN ALL RESPECTS AND IN THEIR ENTIRETY, EXPRESSLY RESERVED.

      Distributions to Holders of Allowed Class 3 Claims and Allowed Class 4 Claims will be conducted as soon as practicable after the Effective Date in the discretion of the Liquidating Trustee, <u>provided, however</u>, that distributions could be delayed by reason of: (a) claims filed after the Effective Date (including claims arising from rejection of executory contracts and unexpired leases); (b) Disputed Claims (including Disputed Claims that are not liquidated); and (c) the Liquidating Trustee's evaluation of the Available Cash.

## I.    INTRODUCTION

      HWFG filed a voluntary petition for relief (the "<u>Petition</u>") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "<u>Bankruptcy Code</u>"), on September 10, 2010 (the "<u>Petition Date</u>"), thereby commencing the above-captioned Chapter 11 Case. HWFG has operated as a debtor in possession since the Petition Date pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or Official Committee of Creditors Holding Unsecured Claims has been appointed in the Chapter 11 Case. The Debtor filed its Plan on March 24, 2011 (Docket No. 51). The First Amended Plan was filed on June 23, 2011 (Docket No. 63). The Plan

envisions a liquidation of all HWFG's remaining non-Cash Assets pursuant to the provisions of the

Bankruptcy Code and in accordance with the terms of the Plan.

### A.    11 U.S.C. § 1125.

This *First Amended Disclosure Statement in Support of the Debtor's First Amended Plan of Liquidation* (as the same may be modified, amended, or supplemented, the "Disclosure Statement") is submitted pursuant to section 1125 of the Bankruptcy Code to holders of impaired Claims in connection with the proceedings seeking confirmation of the Plan. A copy of the Plan is attached hereto as Exhibit A".

This Disclosure Statement sets forth information regarding, among other things, the history of HWFG and its business, the filing of the Petition and the Plan, and alternatives thereto. Its purpose is to provide the holders of impaired Claims adequate information to assist them in making an informed decision regarding acceptance or rejection of the Plan. Each holder of an impaired Claim should read this Disclosure Statement (including its exhibits) and the Plan (including its exhibits) in their entirety and consider them with such holder's legal and financial advisors in connection with the proceedings seeking confirmation of the Plan. No person has been authorized by HWFG to utilize, for purposes of solicitation, any information concerning HWFG or its business, other than the information contained or referred to herein.

### B.    Voting Class.

Pursuant to the Bankruptcy Code, each holder of an Allowed Class 3 Claim and Allowed Class 4 Claim (the "Voting Classes"), is entitled to vote on the Plan. Holders of Allowed Claims in Classes 1 and 2 are presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code because their Claims are not impaired under the Plan. Holders of Equity Interests in Classes 5 and 6 are presumed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code because they will not receive a distribution under the Plan. For a description of the Classes of Claims and Equity Interests and their treatment under the Plan, see Section II of the Plan entitled *"Classification and Treatment of Claims and Equity Interests."*

Except as described below, the Plan may be confirmed only if accepted by the Voting Classes. The Bankruptcy Code defines "acceptance" with respect to a class of impaired Claims, as

acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such class counting only those Holders who cast ballots.

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST FEASIBLE RECOVERIES TO THE HOLDERS OF CLASS 3 CLAIMS AND CLASS 4 CLAIMS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS. THE DEBTOR THEREFORE RECOMMENDS THAT HOLDERS OF CLASS 3 CLAIMS AND CLASS 4 CLAIMS VOTE TO ACCEPT THE PLAN.**

The Debtor anticipates that Holders of Class 3 Claims and Class 4 Claims will vote to accept the Plan. The Debtor reserves the right to modify the Plan in accordance with section 1127(a) of the Bankruptcy Code.

For a more detailed description of the requirements for acceptance of the Plan and of the criteria for confirmation notwithstanding rejection by certain classes, see Section VI of this Disclosure Statement entitled *"Confirmation Procedure."*

**C.     Additional Information.**

Attached as exhibits to this Disclosure Statement are copies of the following:

1.     The Plan (Exhibit "A");

2.     Projected Available Cash Proceeds Analysis (Exhibit "B");

3.     Hypothetical Chapter 7 Liquidation Analysis (Exhibit "C");

4.     List of Pending Litigation (Exhibit "D");

5.     Potential Preference Payments (Exhibit "E");

6.     Potential Third Party Estate Causes of Action (Exhibit "F"); and

7.     The FDIC POC (Exhibit "G") .

Also accompanying this Disclosure Statement and its attendant exhibits, including the Plan, are copies of the following: (i) the Notice of the Order of the Bankruptcy Court approving this Disclosure Statement, and scheduling the Confirmation Hearing, the deadlines and procedures for voting and for objecting to confirmation of the Plan, and related matters (the "Confirmation Hearing Notice"); and (ii) for each Holder of Claims in the Voting Classes (Class 3 and Class 4),

the form of ballot for casting an acceptance or rejection of the Plan.  The Holders of Class 4 Claims will also receive a copy of the Order approving this Disclosure Statement.

### D.    Disclaimer.

The Bankruptcy Court has approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of its books and records, to enable hypothetical, reasonable investors typical of the Holders of impaired Claims in the Voting Classes to make an informed judgment as to whether to accept or reject the Plan.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "COMMISSION") UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR BY ANY STATE AUTHORITY UNDER ANY STATE SECURITIES OR "BLUE SKY" LAW, NOR HAS THE COMMISSION (OR ANY STATE AUTHORITY) PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE AT THE TIMES MADE, TO THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF. HOWEVER, NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE AN ADMISSION OR A DECLARATION AGAINST INTEREST BY THE DEBTOR FOR PURPOSES OF ANY EXISTING OR FUTURE LITIGATION AGAINST THE DEBTOR OR ITS ESTATE.

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, NOTHING CONTAINED HEREIN SHALL BE ATTRIBUTABLE TO OR IS DERIVED FROM OR REPRESENTED TO BE ACCURATE BY THE DEBTOR OR BY ANY OF ITS PROFESSIONAL PERSONS.  NOR HAS THE DEBTOR OR ANY SUCH

PROFESSIONAL PERSON INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN.

ALTHOUGH THE DEBTOR'S PROFESSIONAL PERSONS HAVE ASSISTED IN THE PREPARATION OF THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS RESPECTING FINANCIAL, BUSINESS, AND ACCOUNTING DATA PROVIDED BY THE DEBTOR, THEY HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH HEREIN AND MAKE NO REPRESENTATIONS AS TO THE ACCURACY THEREOF.

After carefully reviewing this Disclosure Statement and the Plan, including the respective exhibits, each Holder of an impaired Claim in the Voting Classes (Class 3 and Class 4) should decide whether to accept or reject the Plan and should indicate its vote on the enclosed Ballot and return it in the envelope provided.

E.      Balloting.

TO BE COUNTED, YOUR BALLOT MUST BE COMPLETELY FILLED IN, SIGNED, AND TRANSMITTED IN THE MANNER SPECIFIED IN THE BALLOT SO THAT IT IS RECEIVED BY THE VOTING DEADLINE SPECIFIED IN THE BALLOT. PLEASE CAREFULLY FOLLOW ALL INSTRUCTIONS CONTAINED IN THE BALLOT. ANY BALLOTS RECEIVED WHICH DO NOT FULLY COMPLY WITH THE BALLOT INSTRUCTIONS WILL NOT BE COUNTED. BALLOTS WHICH INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, OR WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, WILL NOT BE COUNTED.

If you have any questions about the procedure for voting, or if you did not receive a Ballot, received a damaged Ballot, or have lost your Ballot, or if you would like any additional copies of this Disclosure Statement, please contact the Debtor's Ballot tabulator, Patricia Swierszcz ("Ballot Tabulator"), in writing, and send to 1801 Century Park East, Suite 1460, Los Angeles, California, 90067, Facsimile: (310) 557-0056.

### F.    Confirmation Hearing.

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan (the "Confirmation Hearing") on the date and at the place specified in the Confirmation Hearing Notice accompanying this Disclosure Statement.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before the date specified, and in the manner described, in the Confirmation Hearing Notice.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing or at any subsequent continued Confirmation Hearing.

## II.    SUMMARY

The following is a summary of certain information contained elsewhere in this Disclosure Statement.  Reference is made to, and this Summary is qualified in its entirety by reference to, the more detailed information contained herein and in the exhibits hereto.  Holders of impaired Claims are urged to read this Disclosure Statement, the Plan and their respective exhibits in their entirety.

### A.    The Debtor.

The Debtor is a savings and loan holding company that was incorporated in Delaware in 1995, and commenced operations after it was registered as a thrift holding company in April 1996. Upon its registration as a bank holding company, the Debtor acquired all of the issued and outstanding securities of Los Padres Bank, FSB (the "Bank").  The Debtor was formed as a savings and loan holding company to provide additional flexibility to the organization through the ability to serve a broader geographic area, expand its product offerings, access capital markets through the ability to issue debt and other financial instruments, and to gain certain tax benefits.  Its principal business was to serve as the holding company for its wholly-owned subsidiary and principal asset, the Bank.  As of August 1, 2010, the Bank had eleven (11) full-service banking branches located in the Central Coast of California and three (3) full service banking branches in the Phoenix metropolitan area in Arizona.  The Bank engaged in single family, multi-family and commercial lending primarily in its direct market areas.

9

As a savings and loan holding company, the Debtor was subject to regulation by the Office of Thrift Supervision ("OTS").  The Bank's deposits were insured through the Deposit Insurance Fund of the FDIC, and the Bank was subject to regulation by the FDIC.

### B.    Overview of the Plan.

THE FOLLOWING OVERVIEW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED HERETO AS EXHIBIT "A".  IN THE EVENT OF ANY INCONSISTENCY, THE PLAN WILL CONTROL.

The Plan provides for the liquidation of substantially all of the non-Cash Assets of the Debtor and the distribution of the Available Cash to Holders of Allowed Claims, consistent with the priority provisions of the Bankruptcy Code, and in accordance with the Plan.  The Plan does not provide for any distribution to holders of Allowed Equity Interests unless and until Holders of Allowed Class 4 Claims have been paid in full, which -- as set forth in the projections attached as Exhibit "B" hereto-- is not projected to occur.

### C.    Recommendation.

The Debtor believes that the Plan provides the best feasible recoveries to Holders of Allowed Class 3 Claims and Allowed Class 4 Claims and is in the best interests of such Holders. ACCORDINGLY, THE DEBTOR RECOMMENDS THAT ALL SUCH HOLDERS ACCEPT THE PLAN.

## III.    BACKGROUND

As more fully described below, the Plan provides that all Assets of the Estate remaining on the Effective Date will vest in the Liquidating Trust.  The Available Cash will be distributed to the Debtor's creditors by the Liquidating Trustee in accordance with applicable provisions of the Bankruptcy Code and in accordance with the Plan, and the Liquidating Trustee will be appointed to, among other things, handle prosecution and recovery of any and all Estate Causes of Action that may bring Cash into the Liquidating Trust, and sell any other Assets that may have value, bring any potential avoidance actions, and object to any claims.

### A.    The Debtor's Business.

On August 20, 2010, the OTS closed the Debtor's wholly-owned subsidiary and primary Asset, the Bank, and the FDIC was appointed as a receiver for the assets and liabilities of the Bank. Upon its appointment as receiver for the Bank, the FDIC entered into a purchase and assumption agreement with Pacific Western Bank to assume all of the Bank's deposits and certain other of its assets and liabilities.

As reflected in Section II.A. above, prior to the Bank's closure, the Debtor's primary business was to serve as a holding company for the Bank. Other than the business conducted by the Bank, on the Petition Date, the Debtor did not own or engage in any other operating businesses. As a legal entity separate and distinct from its subsidiary Bank, the Debtor's principal source of funds was dividends that were paid by the Bank and financing obtained by the Debtor as discussed below.

As a result of the loss of its primary financial Asset, the Debtor commenced this Chapter 11 Case by filing a Petition on the Petition Date.

### B.    The Debtor's Financing.

#### 1.    Secured Indebtedness.

The Debtor has no secured indebtedness.

#### 2.    Unsecured Indebtedness.

Class 4 Claim: The bulk of Debtor's unsecured indebtedness consists of the Indenture Trustee Claim classified in Class 4 of the Plan. Between September 2003 and September 2004, the Debtor raised approximately $25.8 million of capital through two (2) statutory business trusts ("Statutory Business Trusts") that were established in approximately September 2003 and September 2004 respectively. The Debtor sponsored the Statutory Business Trusts for the purpose of selling and administering trust originated preferred securities ("TRUPs"). The Debtor guaranteed certain performance obligations of the Statutory Business Trusts (as distinguished from payment obligations) pursuant to the Guarantee Agreements. The Statutory Business Trusts sold the TRUPs to investors and then used the proceeds of the sale of the TRUPs to purchase from the Debtor junior subordinated deferrable interest Debentures pursuant to two Indentures: (i) the

1   Indenture dated as of September 25, 2003 by and between the Debtor and Wilmington Trust

2   Company as indenture trustee thereunder ("Wilmington Trust") in the total principal amount of

3   $15,464,000 due 2033 and (ii) the Indenture dated as of September 27, 2004 by and between the

4   Debtor and Wells Fargo Bank, National Association ("Wells Fargo") in the total principal amount

5   of $10,310,000 due 2034 (Wells Fargo and Wilmington Trust collectively referred to as the

6   "Indenture Trustees" when acting in that capacity). The total aggregate amount owing under the

7   two Indentures as of the Petition Date is $25,774,000 in original principal *plus* (b) approximately

8   $1,481,616 in accrued but unpaid interest as of the Petition Date.[2]

9         The sole assets of the Statutory Business Trusts are the Debentures issued by the Debtor

10  and the sole obligations of each Statutory Business Trust relate to the TRUPs it issued (other than

11  the payment of fees, expenses, and other amounts to the trustees of the respective Statutory

12  Business Trusts). As a result, the Statutory Business Trusts are essentially conduits, or pass

13  through entities, organized for the primary purpose of paying amounts received on the Debentures

14  to the holders of the TRUPs. The Debentures are governed by the Indentures and the Statutory

15  Business Trusts are governed by the Declaration of Trusts. One institution typically serves as the

16  trustee under both the Indentures (the Indenture Trustees) and the Declaration of Trusts ("TRUP

17  Trustees"). In this case Wells Fargo and Wilmington Trust are both the Indenture Trustees and

18  the TRUP Trustees.

19        The Declaration of Trusts provide that upon an event of default, including the filing of a

20  chapter 11 case by the Debtor, the TRUP Trustees are to distribute the Debentures directly to the

21  holders of the TRUPs, thereby entitling them to directly exercise the right to authorize, consent to,

22  and take other actions with respect to the Debentures. To date, the TRUP Trustees have not

23  distributed the Debentures to the holders of the TRUPs.[3] Furthermore, the Indentures provide that

24  the Indenture Trustees are not authorized to accept or adopt any chapter 11 plan on behalf of the

25  holders of the TRUPs.[4] Due to the single purpose, pass-through nature of the Statutory Business

---

[2]    The cash raised was typically down-streamed by the Debtor to the Bank to provide adequate capital to support the Bank's strategic plan initiatives, fulfilling regulatory capital requirements, and providing capital and liquidity for general operating purposes.

[3]    The Declaration of Trusts provide that the TRUP Trustees are not required to distribute the Debentures if doing so would be impractical.

[4]    Section 5.02 states "Nothing herein contained shall be construed to authorize the Trustee to authorize or consent

12

Trusts and the clear instruction of the Indentures and the Declaration of Trusts that holders of the

TRUPs have the right to receive a distribution on account of the Debentures and exercise

ownership and voting rights associated with the Debentures, only the holders of the TRUPs are

entitled to vote on the Plan directly.[5]

Class 3 Claim: The balance of other unsecured indebtedness is classified in Class 3 of the

Plan, which includes (i) franchise taxes owed to the State of Delaware (the jurisdiction of Debtor's

incorporation), (ii) unliquidated intercompany claims that may be held by the FDIC as receiver for

the Bank and any other portion of the FDIC POC that may be determined not to be an Other

Priority Claim, (iii) potential claims arising from the rejection of executory contracts and

unexpired leases, (iv) unliquidated claims for pre-petition professional services rendered, and (v)

other vendor claims in Class 3 of the Plan.

### 3.    Equity Interests.

There are two types of equity, HWFG Preferred Stock Interests and HWFG Common

Stock Interests.

(a)    HWFG Preferred Stock Interests (Class 5) – In or about September

2008, the Debtor raised approximately $3,301,000 through the issuance of the HWFG Preferred

Stock Interests.  As of the Petition Date, 57,000 shares of HWFG Preferred Stock Interests were

issued and outstanding.  The HWFG Preferred Stock Interests are privately held.  The HWFG

Preferred Stock Interests rank senior to the HWFG Common Stock Interests and as such have

rights, preferences and privileges which are superior to the HWFG Common Stock Interests,

including, dividend and liquidation preferences.[6]

The Holders of Preferred Stock Interests are not receiving any distribution under the Plan

and therefore are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

---

to or accept or adopt on behalf of any Security holder any plan of organization, arrangement, adjustment or composition
affecting the [Debentures] or the rights of any holder thereof or to authorize the Trustee to vote in respect of the claim of
any Security holder in any such proceeding.

[5]    See 11 U.S.C. § 1126 (providing that a "holder of a claim of interest allowed under section 502 of this title may
accept or reject a plan.")(emphasis added); see also 11 U.S.C. § 101(5)(A)(defining a claim as the "right to payment,
whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,
disputed, legal, equitable, secured or unsecured. . . . .")(emphasis added).

[6]    The HWFG Preferred Stock Interests could be converted to common shares at the option of the Holder of
HWFG Preferred Stock Interests.

(b)    HWFG Common Stock Interests (Class 6) - As of the Petition Date, the Debtor had 7,364,089 shares of HWFG Common Stock Interests issued and outstanding. Except as otherwise provided under the law, the HWFG Common Stock Interests have no special rights, preferences or privileges.  In liquidation, if there are any assets remaining of the Debtor legally available for distribution to stockholders after payment or provision for payment of all debts and liabilities of the Debtor, the order of priority is:  (a) the Holders of the HWFG Preferred Stock Interests to the extent of their liquidation preference; and (b) all remaining assets are distributed to the Holders of HWFG Common Stock Interests.  The HWFG Common Stock Interests were publicly traded until such stock was delisted from the NASDAQ stock exchange as set forth below. Currently, the HWFG Common Stock Interests are traded in the over-the-counter market on the Pink Sheets under the symbol "HWFG."

The Holders of HWFG Common Stock Interests are not receiving any distribution under the Plan and therefore are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.    Events Leading Up to Bankruptcy.[7]**

**1.    Overall Business Erosion - Declining Real Estate Market and Increasing Unemployment.**

Prior to 2009, the principal business of the Bank was attracting checking and savings deposits from the general public and using those deposits, together with borrowings and other funds, to make real estate, business and consumer loans and invest in certain residential mortgage backed securities ("RMBS").

Beginning in late 2007, the residential real estate markets in the Bank's principal markets of Arizona and California started to decline in value and defaults on mortgage loans began to rise.

---

[7]    Nothing in this Disclosure Statement, including the Debtor's description of any events prior to the Bank's closure on August 20, 2010, is intended to, nor shall anything herein be construed in any manner to, modify, limit, waive, diminish, impair, release, or otherwise affect any rights, claims, actions, defenses, setoffs, recoupments, or other matters to which the FDIC may be entitled under any agreements or at law or in equity or under the United States Constitution.  Absent resolution by mutual agreement, any claims or contentions of the FDIC and Debtor and any rights and remedies with respect thereto shall be determined by a court or courts of competent jurisdiction without any prejudice from this Disclosure Statement. The Debtor disputes the FDIC's purported claims and contentions with respect to the foregoing. Both the FDIC and the Debtor reserve their respective rights to dispute their respective claims and contentions.

14

The availability of mortgage credit through RMBS started to decline precipitously as the underlying liquidity and demand for the RMBS decreased due to rising defaults and losses. This caused increased strain in the residential housing market, which in turn caused further decline in the value of the residential real estate.

Although the Bank had a diversified portfolio of loans across residential and commercial properties and a non-mortgage loan portfolio of commercial and industrial loans, the broad decline in real estate values caused loan delinquencies to rise, especially on its residential construction and later commercial real estate construction loans. These construction loans were dependent on sales of the underlying collateral or borrower funds for interest and principal payments on the loans. With the rapidly falling real estate values, a lack of buyers, and constrained financing sources, the underlying collateral value of these loans continued to decline sharply and debts went unpaid due to a lack of cash flow. Loan defaults ensued with, in most cases, the eventual repossession of the underlying collateral. Collateral underlying defaulted and weak loans was re-appraised and the loans were written-down to current market values of the underlying collateral less the cost to sell the collateral, resulting in significant losses to the Bank.

In 2008 and continuing into 2010, the residential real estate decline became a full blown economic recession with rapidly falling consumer demand and rising unemployment. In both Arizona and California, unemployment levels exceeded 10% by the last quarter of 2009 and into 2010. This caused additional stress on the Bank's loan portfolio as businesses experienced much lower sales and reduced profits or losses. The weaker financial performance of businesses caused even further reduced cash flow to service their debt and to pay rents. This situation caused commercial real estate and business loan defaults to rise. Although the Bank applied prudent underwriting standards for the loans with respect to debt service coverage and loan to value ratios, the swift decline in real estate values and the rising unemployment in Arizona and California were too severe and resulted in rising loan defaults and increased losses for the Bank.

A compounding effect to the loan losses was the rising delinquencies and losses on the Bank's investment portfolio of initially investment grade RMBS. This portfolio was largely originally rated "AAA" or "AA" by the nationally recognized rating agencies but as the steep

decline in real estate values and the economic recession took hold, the delinquency and default

rates on the RMBS underlying loans increased dramatically with high losses on the repossessed

real estate, causing significant mark to market losses and impairments on the RMBS. The Bank's

management conducted stress tests on the cash flows of these RMBS of two (2) to three (3)

standard deviations of currently projected default rates, but the real estate debacle proved the

default rates to be over ten (10) standard deviations of the widely accepted normal deviations by

the rating agencies and market participants.

### 2. Regulatory Actions By The OTS.

As a result of the above, between 2009 and 2010, several regulatory enforcement actions

were taken by the OTS concerning the Debtor and the Bank.

### (a) OTS Supervisory Agreements.

On or about April 24, 2009, both the Debtor and the Bank entered into Supervisory

Agreements with the OTS that, among other things, placed operating and financial restrictions on

both entities and required that the capital ratios of the Bank be increased to 6% core tangible and

11% risk-based by June 30, 2009 and 7% core tangible and 12% risk-based by September 30,

2009.  The Supervisory Agreements also required, among other things, that the Bank submit a

capital plan, revise and implement several Bank policies, and have the asset quality of its

commercial loan portfolio reviewed by an independent contractor. The Debtor and Bank submitted

their capital plan on or about May 1, 2009 reflecting that they were able to comply respectively

with each and every one of the requirements in the Supervisory Agreements except satisfying the

required capital ratio levels by the prescribed dates due to the further loan and RMBS losses and

reserves for loan losses realized by the Bank (and some forced by the OTS) emanating from the

adverse economic and real estate environment.

### (b) August 2009 - OTS Prompt Corrective Action Notice.

After an OTS examination in the Summer of 2009, the OTS, on or about August 20, 2009,

issued a Prompt Corrective Action notice to the Debtor and the Bank requiring, among other

things, that the Bank increase its capital ratio to adequate capitalization levels of 4% core tangible

and 8% total risk- based.  The Debtor and Bank complied with the Prompt Corrective Action and

16

1   filed a capital restoration plan on or about September 22, 2009 reflecting that the Debtor would be

2   exceeding the required capital ratio levels after the sale of the Bank's Kansas City metropolitan

3   bank division in November 2009 as discussed in further detail below.

### (c)   OTS Cease and Desist Orders.

5          On or about October 14, 2009, the Debtor and the Bank were directed through Cease and

6   Desist Orders ("CDO") to increase the Bank's capital ratios to adequately capitalized of 4% core

7   tangible and 8% risk-based capital by November 6, 2009, and then 8% core tangible and 12% risk-

8   based capital by December 31, 2009. The CDO, among other things, left in place the operating and

9   financial restrictions from the prior Supervisory Agreements, added additional restrictions, required

10  revisions to several policies, and required the Bank to develop a capital plan to meet the capital

11  ratio requirements. Additionally, the CDO required that a concentrations risk management policy

12  be established and that the Debtor agree to reduce classified assets. Again, the Debtor and the Bank

13  complied with each of the non-capital related restrictions and requirements. The Bank was also

14  able to reach the first capital ratio hurdle set forth in the CDO and to satisfy the August Prompt

15  Corrective Action notice with the sale of its Bank division in the Kansas City metropolitan area for

16  a $4.1 million premium on November 6, 2009,[8] but was unable to meet the higher mandated capital

17  requirements by December 31, 2009. The OTS rejected the Debtor's and Bank's capital plan

18  submitted on or about October 30, 2009 on the premise that it did not have a credible capital source

19  with a definitive agreement to complete a capital transaction sufficient to meet the capital ratios

20  required on December 31, 2009.  The OTS required and the Bank agreed to amend its capital plan

21  to qualify that it would use any and all means to recapitalize the Bank.

### (d)   April 2010 - OTS Prompt Corrective Action Notice.

23         After further examination by the OTS in March and April of 2010 and with the OTS'

24  demands for higher loan loss reserves based on the OTS' subjective analysis of the loan loss

25  reserve and further write-downs of the RMBS portfolio due to the continued defaults of and

26  declines in the residential properties collateralizing the loans in the Bank's RMBS, the Bank again

27  fell below the adequately capitalized level of 4% core tangible capital and 8% risk-based capital.

28  _____

[8]      The Debtor and Bank received formal approval from the OTS that they were relieved from the August Prompt
Correction Action status after the sale of the Kansas City metropolitan area Bank division.

On or about April 23, 2010 the OTS issued a Prompt Corrective Action notice to the Debtor and the Bank requiring the filing of a capital restoration plan and immediate restoration of the Bank's capital levels to the adequately capitalized level of 4% core tangible and 8% total risk-based capital. The Bank filed another capital restoration plan on or about May 10, 2010, as required by the OTS, which was again rejected due to the lack of a definitive agreement for a capital raise or acquisition or merger sufficient to meet the capital requirements.

During the period from the signing of the Supervisory Agreements with the OTS to the date the OTS closed the Bank and appointed the FDIC as receiver on August 20, 2010, the Debtor and the Bank continued making every effort to achieve the capital requirements as set forth above and to satisfy all the other onerous requirements established by the OTS. The Bank and Debtor filed timely bi-weekly reports of its efforts with the OTS, and up until the Bank's closure had viable recapitalization options they were pursuing as set forth in detail below.

### 3.    Capital Raising Efforts Between 2007 and 2010.

The Debtor understood that the economic downturn would adversely impact not only its capital ratios, which were the OTS' primary measurement of the Bank's stability, but also its overall financial condition. Management was proactive in trying to boost its capital ratios through multiple efforts.

Between approximately December 31, 2007 and December 31, 2009, the Debtor raised approximately $11.7 million through the sale and issuance of its common and preferred stock as follows: (i) in or about March of 2008, the Debtor engaged in a private placement offering of its common stock and raised approximately $4.3 million; (ii) in or about September 2008, despite the fact that the real estate market worsened and the deep economic recession ensued with higher losses for the Bank, the Debtor was able to raise another approximately $6.9 million from private equity sources and individuals through a common and preferred stock offering; and (iii) in or about March 2009, the Debtor again raised approximately $500,000 through a private common stock offering to an individual.

On or about July 27, 2009, Debtor's management engaged Oak Ridge Financial to assist it and the Bank to explore a major recapitalization or sale of the Bank. Hundreds of potential

1    acquirers and capital providers were contacted.  Several private equity firms delivered letters of

2    intent to recapitalize the Bank to the required capital ratios and conducted due diligence on the

3    Debtor and the Bank.  One such recapitalization was to contribute the classified assets and RMBS

4    owned by the Bank to a special purpose entity, majority owned subsidiary of the Bank that would

5    be separately capitalized with preferred stock, and then funds from another capital raise by the

6    Debtor from the sale of its common stock would be down-streamed to the Bank.  This

7    recapitalization would have met OTS's capital ratio requirements but the OTS summarily rejected

8    this plan due to a revised interpretation of the capital treatment of the preferred stock of the special

9    purpose entity.

10        In or about the end of April 2010, after no recapitalization or sale had occurred, the Debtor

11    terminated its engagement of Oak Ridge Financial and engaged another company, Luminous

12    Ventures. Luminous Ventures was retained in or about early June 2010 to conduct due diligence

13    and seek an approximately $60 million recapitalization of the Bank through the sale of common

14    and preferred stock of the Debtor, with Steadfast Companies as the lead investor.    The

15    recapitalization unfortunately could not be accomplished in the time period allowed by the OTS.

16        Also in April 2010, in a further effort to raise capital, the Debtor engaged Hexagon Capital

17    Markets, LLC to assist it in deleveraging the Debtor so as to make it more attractive to potential

18    investors. Hexagon and the Debtor developed a comprehensive proposal to the holders of TRUPs

19    to redeem the TRUPs at discount to par but well in excess of what could be expected if the

20    Debtor's primary Asset, the Bank, was closed by the OTS. This proposal was contingent on a

21    capital raise. After lengthy discussions between Hexagon and associates of the TRUP owners, it

22    was determined that such redemption efforts would likely be fruitless.

23        While exploring the redemption option above, the Debtor was also investigating a potential

24    merger with another bank holding company. The Debtor and the Bank were near completion of a

25    definitive merger agreement with a publicly traded company (in formation as a bank holding

26    company) valued at approximately $88 million of cash equity. The merger was delayed by

27    complications with the company's other acquisition venture in Nevada.

28

In July 2010, the Debtor and Bank's management were contacted by at least three (3) different entities that were interested in acquiring the Debtor and/or Bank, however, after such entities became aware of the FDIC's marketing process discussed below, the discussions with these entities ceased and some decided to bid on the Bank through the FDIC's bidding process.

While investigating the various options discussed above, the Debtor and Bank's management continued to take aggressive steps to reduce problem assets and overall asset levels to boost capital ratios. From approximately December 31, 2007 to approximately March 31, 2010, the Debtor and Bank reduced the Bank's assets by approximately $293 million from approximately $1.2 billion to approximately $903 million. This reduction in assets was accomplished through the sale and payoff of loans and the sale of approximately $100 million in assets and approximately $92 million of its deposits of its Bank division in the Kansas City metropolitan area. As mentioned above, this sale of the Kansas City Bank division not only boosted the capital ratios but resulted in the Bank earning a $4.1 million premium for the sale.

### 4.    Common Stock Delisting From NASDAQ.

Prior to October 2009, the Debtor's HWFG Common Stock Interests were publicly traded on the NASDAQ stock exchange under the symbol "HWFG". In or about October 2009, the Debtor was notified by NASDAQ that it was subject to delisting given that the aggregate market value of its common stock had fallen to below $5.0 million and the trading value of its common shares had dropped below $1 per share. Given the unlikelihood that the Debtor would be able to reach the NASDAQ requirements within the required timeframes, it voluntarily delisted from NASDAQ on or about December 4, 2009 and simultaneously started to trade its common stock on the Over the Counter Bulletin Board and related Pink Sheets under the symbol of "HWFG".

### 5.    FDIC's Marketing Of The Bank.

In or about the end of May 2010, the Debtor and Bank's management were notified that the FDIC's resolution process was beginning with the gathering of marketing and financial information on the Bank in the FDIC's format. This gathering of information took approximately three (3) weeks. In its initial meeting regarding such process with the FDIC, the Debtor's management expressed the concern that any leak of information regarding the existence of the

FDIC's marketing process would seriously adversely impact the Debtor's and Bank's ability to raise capital.  The FDIC ignored these concerns and the marketplace became aware of the resolution process, which effectively caused the termination of all recapitalization/sale alternatives the Debtor was then pursuing.

### D.    Debtor in Possession Administration.

The Debtor commenced its Chapter 11 Case on the Petition Date to implement the liquidation of the Debtor's assets and operations.  Between the Petition Date and April 30, 2011, the Debtor had two employees assist in administering the Debtor's estate, both of whom were officers of the Debtor pre-Petition:  Craig Cerny, Chief Executive Officer and Chairman of the Board, and William Phillips, Jr., President. Mr. Phillips handled the day-to-day administration of the estate. Beginning in May 2011, only one employee was retained to administer the estate. The former Chief Financial Officer, Kerry Steele, was retained by the Board of Directors to replace Mr. Phillips after he accepted another job offer.  Ms. Steele, as Chief Financial Officer, is now charged with administering the estate.

The Debtor's current Board of Directors are the following persons: William D. Ross, Timothy Hatlestad, Paul Halme, and Craig Cerny.

The Debtor has taken the following steps to efficiently administer its Chapter 11 Case to date:

### 1.    Application to Employ Landau Gottfried & Berger LLP As Bankruptcy Counsel.

On September 13, 2010, the Debtor filed an application to employ Landau Gottfried & Berger, LLP ("LGB") as its bankruptcy counsel (Docket No. 2).  By Order entered on October 1, 2010, the Bankruptcy Court approved the employment of LGB (Docket No. 16).

### 2.    Application to Employ Crowe Horwath LLP as Accountants.

On September 29, 2010, the Debtor filed its application to employ Crowe Horwath LLP ("Crowe"), its pre-Petition accountants (Docket No. 14).  By Order entered on October 18, 2010, the Bankruptcy Court approved the employment of Crowe as the Debtor's accountants (Docket No. 19).  As noted, one of the principal assets of the Debtor is its right to receive a refund of its federal

taxes estimated to be in an amount of more than $9 million ("Tax Refund") as a result of the

enactment, on November 6, 2009, of the Worker, Homeownership, and Business Assistance Act of

2009 (the "WHBAA"), and the promulgation of Revenue Procedure 2009-52, which permit

companies to carry back Net Operating Losses ("NOL") and Alternative Minimum Tax Net

Operating Losses ("ATNOL") incurred in either the 2008 or 2009 tax years for a period of five (5)

years versus the two (2) year period under the old rule.

However, the amount of the Tax Refund is not certain, and some or all of it may be

claimed by the FDIC as receiver for the Bank, thus raising complex legal and accountancy issues.

Crowe was retained to prepare and file the Debtor's amended tax returns for prior tax years (2004 –

2007), which reflect the approximately $9 million Tax Refund and to handle any other tax matters

that arise during the Chapter 11 Case, including, but not limited to, assisting in the recovery of any

state or local tax refunds that may exist for prior tax years and preparing the 2010 Federal and State

tax returns.  Crowe was retained on account of its experience in the banking sector and its direct

experience, gleaned in other bank holding company bankruptcy cases, of the legal and accountancy

issues arising in connection with the Tax Refund.

### 3.    Bar Date Motion.

On October 18, 2010, the Debtor filed its *Notice of Motion and Motion for Entry of an*

*Order (I) Establishing Bar Dates for Filing Proofs of Claim or Interest; and (II) Approving the*

*Form and Manner of Notice Thereof* (Docket No. 18) ("Bar Date Motion").  Pursuant to an Order

of the Bankruptcy Court entered on November 15, 2010 (Docket No. 25), the Bar Date Motion was

approved, as modified by the Order, and the Bar Date for filing proofs of claim was fixed as

January 20, 2011 (the "Bar Date").  The last date for "governmental units" (as defined in section

101(27) of the Bankruptcy Code) to file proofs of claim was set for March 9, 2011.  On November

17, 2010, the Debtor served on all creditors, equity holders and other parties-in-interest and filed

with the Bankruptcy Court its *Notice of Bar Date for Filing Proofs of Claim or Interest against*

*Debtor and Debtor-in-Possession Harrington West Financial Group, Inc.*  (Docket No. 27).

### 4.    Extension of Exclusivity to File Plan and Solicit

On January 6, 2011, the Debtor filed its *Notice Of Motion And Motion For Entry Of An Order Pursuant To Section 1121(D) Of The Bankruptcy Code Extending The Periods In Which The Debtor Exclusively May File A Chapter 11 Plan And Solicit Acceptances Thereto* (Docket No. 36). By Order entered on February 7, 2011, the Court approved the Motion and the deadlines to file a plan and solicit acceptance of the same were extended to April 8, 2011 and June 7, 2011 respectively.  The Order provided, among other things, that the Court would grant no further extensions.

### 5.    Application to Employ BMC Group, Inc. as Noticing and Solicitation Agent.

On March 1, 2010, the Debtor filed an application to employ BMC Group, Inc. ("<u>BMC</u>") to act as the Debtor's agent to provide notice services in connection with approval of this Disclosure Statement and notice of the hearing to consider confirmation of the Plan and dissemination of court-approved solicitation materials. (Docket No. 47).  A Supplemental pleading was filed in support of retention of BMC  (Docket No. 56).  By Order entered on April 11, 2011, the Court approved the employment of BMC as the Debtor's Noticing and Solicitation Agent (Docket No. 57).

### 6.    Schedules and Statement of Financial Affairs.

On the Petition Date, the Debtor filed its Schedules, Statement of Financial Affairs, and all other required documents with the Bankruptcy Court.

### 7.    Tax Audit and IRS Refunds.

The Internal Revenue Service ("<u>IRS</u>") has commenced an audit of the Debtor's federal income tax returns for the 2004 through 2009 tax years.  The Debtor's accountants, Crowe, are handling all communications with and document requests by the IRS.

As previously noted, the Debtor may be eligible to claim a Tax Refund of its federal taxes in an amount estimated to be more than $9 million due to a change in the tax law promulgated under the WHBAA Revenue and Procedure 2009-52 permitting companies to carry back NOLs and ATNOLs incurred in either the 2008 or 2009 tax years for a period of five (5) years versus the (2) year period under the old rule.  However, the amount of such Tax Refund is not certain and as

23

reflected in the FDIC POC, some or all of the Tax Refund may be claimed by the FDIC as receiver

for the Bank.  Further, there can be no guaranty that the Tax Refund will be allowed by the IRS in

full or in part or that the Debtor, as opposed to the FDIC as receiver for the Bank, will receive any,

or any material portion of, any such Tax Refund.[9]

### 8.    Insurance Refunds.

During the Chapter 11 Case, the Debtor reviewed its existing insurance policies which

were pre-paid prior to the Petition Date.  After such review, the Debtor, through its insurance

broker, terminated and/or reduced certain policies.  As a result of the same, the Debtor anticipates

it may recover approximately $99,661 in cash refunds from these cancellations for the benefit of its

Estate and its creditors.[10]  To date, the Debtor has recovered approximately $47,133 of these funds.

### 9.    FDIC Proof of Claim.

On March 9, 2011, the FDIC filed the FDIC POC in the Debtor's Chapter 11 Case.  As

filed, the FDIC POC is for an unliquidated amount and alleges both unsecured and priority claims

pursuant to 11 U.S.C. § 507(a)(9) and/or other applicable authority.  A copy of the FDIC POC is

attached hereto as Exhibit "G".

TO THE EXTENT THAT THE FDIC POC BECOMES AN ALLOWED CLAIM, SOME

OR ALL OF SUCH ALLOWED CLAIM MAY BE CLASSIFIED AS A CLASS 1 PRIORITY

CLAIM.  DISTRIBUTIONS MADE ON ACCOUNT OF ANY ALLOWED CLASS 1 CLAIM OF

THE FDIC SHALL BE IN ACCORDANCE WITH THE PRIORITY OF SUCH ALLOWED

CLAIM UNDER 11 U.S.C. § 507(a)(9) AND/OR OTHER APPLICABLE LAW.  ANY SUCH

ALLOWED CLASS 1 CLAIM WILL REDUCE AND MAY COMPLETELY ELIMINATE THE

---

[9]    Counsel for the Debtor and the FDIC are in discussions to establish, subject to Bankruptcy Court approval, an escrow account where any Tax Refund received will be deposited. It is anticipated that a stipulation between the FDIC and Debtor would provide that the Tax Refund, if any, would remain in the escrow account until such time as the dispute between the Debtor's estate and the FDIC is resolved. The FDIC has informed the Debtor that it is in the process of reviewing the various tax refund applications, audits, and other activities relating to potential tax refunds, including the Tax Refund. Nothing herein shall be deemed to have the effect of, nor shall the same waive, diminish, impair, release or otherwise affect the FDIC and Debtor's respective claims to ownership and/or allocation of any tax refunds, including the Tax Refund, that is now owed or payable or hereafter owed or payable or paid by any federal, state and/or local taxing authority with respect to the Debtor, the Bank or any of their subsidiaries or affiliates or the consolidated group of which they are members. Both the Debtor and FDIC reserve their rights to dispute their respective claims and contentions.

[10]    Approximately $52,528 of these insurance refunds were erroneously transferred by the Debtor's insurance broker, Lockton Insurance, to the FDIC. The Debtor, or the Liquidating Trustee, may take steps to recover these funds from the FDIC. To date, the FDIC has not returned these funds and claims an interest in some or all of these funds.

24

AMOUNTS AVAILABLE FOR DISTRIBUTION TO OTHER UNSECURED CREDITORS OF THE DEBTOR. THE DEBTOR DISPUTES THE FDIC POC. THE RIGHTS OF THE DEBTOR AND THE LIQUIDATING TRUSTEE, ON BEHALF OF THE LIQUIDATING TRUST, WITH RESPECT TO THE FDIC POC ARE, IN ALL RESPECTS AND IN THEIR ENTIRETY, EXPRESSLY RESERVED.

### E.   Prosecution of Estate Causes of Action.

#### 1.   Estate Causes of Action Against Third Parties.

The Debtor and its professionals have made a diligent effort to identify in Exhibit "F" to this Disclosure Statement, all Estate Causes of Action against third parties other than preference/fraudulent transfer actions and objections to Claims. No reliance should be placed on the fact that a particular Estate Cause of Action is or is not identified in Exhibits "E" and "F" because the lists are non-exclusive and may be amended prior to the Confirmation Date to provide for additional disclosures. The Liquidating Trustee may seek to investigate, file and prosecute Estate Causes of Action after the Effective Date of the Plan, whether or not the Estate Causes of Action are identified in the Disclosure Statement. As reflected in Section V of the Plan, on the Effective Date, any and all Estate Causes of Action the Estate may have against any third parties shall be vested in the Liquidating Trust and Section V of the Plan provides that the Liquidating Trustee has the authority to prosecute these Estate Causes of Action.

#### 2.   Recovery of Preferential or Fraudulent Transfers.

The Liquidating Trustee will investigate whether certain prepetition payments to creditors may be recovered pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code or applicable State law. Exhibit "E" to the Disclosure Statement lists and/or identifies (i) all payments to creditors made within ninety (90) days of the Petition Date, (ii) all payments to insiders made within one (1) year of the Petition Date, and (iii) all distributions given to an insider of the Debtor, including compensation in any form, bonuses, loans, stock, redemptions, and options exercised, also within one year of the Petition Date. Each transfer listed therein and all other prepetition transfers and obligations of the Debtor will be evaluated to determine whether the transfer or obligation is avoidable on any grounds. Any creditor or party in interest that received a transfer

from the Debtor within four (4) years prior to the Petition Date or in whose favor the Debtor

incurred an obligation may be the subject of an Estate Cause of Action on account of such transfer

or obligation if grounds exist to avoid the transfer or obligation.  The Liquidating Trustee has the

authority to prosecute preferential and fraudulent transfers.  See Section V of the Plan.

### 3.    Objections to Claims.

To date, the Debtor has not filed any objections to Claims.  As set forth in Section V of the

Plan, after the Effective Date, the Liquidating Trustee has the authority to object, prosecute, and

settle Claims.

## IV.    THE FIRST AMENDED PLAN OF LIQUIDATION

A DETAILED CHART SETTING FORTH EACH CLASS DESIGNATED UNDER THE

PLAN, THE PROPOSED TREATMENT UNDER THE PLAN OF EACH CLASS, THE

PROJECTED RECOVERY UNDER THE PLAN FOR EACH CLASS, AND WHETHER A

CLASS IS ENTITLED TO VOTE, IS SET FORTH AT THE OUTSET OF THIS DISCLOSURE

STATEMENT. *See* **Plan Summary**.

The Plan envisions a liquidation of all remaining Assets of the Debtor's Estate by the

Liquidating Trustee.  The Assets of the Estate will vest in the Liquidating Trust upon the Effective

Date and will be distributed consistent with the Bankruptcy Code priority scheme and in

accordance with the terms of the Plan and the Liquidating Trust Agreement.

The Debtor believes that through the Plan: (x) Holders of impaired unsecured Claims will

obtain a greater recovery than would be available if the Debtor's Assets were liquidated in any

other manner under the Bankruptcy Code or if any other feasible alternatives were pursued; and (y)

the value of the Assets of the Estate will be maximized by converting the Assets of the Estate into

Cash in the most efficient and economical manner.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST FEASIBLE

RECOVERIES TO THE HOLDERS OF IMPAIRED CLAIMS AND THAT ACCEPTANCE OF

THE PLAN IS IN THE BEST INTERESTS OF SUCH HOLDERS.  THE DEBTOR

THEREFORE RECOMMENDS THAT HOLDERS OF IMPAIRED CLAIMS ACCEPT THE

PLAN.

In accordance with the Bankruptcy Code, the Plan classifies Claims and Equity Interests separately and provides, separately for each Class, that Holders of Claims or Equity Interests in the Class will receive various types of consideration, thereby giving effect to the different rights of the Holders in each Class.

In general, under the Plan, on the Effective Date, all of the Estate's Assets will vest in the Liquidating Trust and the Allowed Administrative Expenses, Allowed Priority Tax Claims, and the Allowed Class 1 Claims and Allowed Class 2 Claims will receive payment from the Liquidating Trustee in full in Cash or as otherwise noted in the Plan. If these claims remain unpaid after the Effective Date, the Liquidating Trustee has authority under the Liquidating Trust Agreement to create reserves to ensure payment as required under the Plan.

Each Holder of an Allowed Class 3 Claim will receive, as soon as practicable in the discretion of the Liquidating Trustee a Pro Rata Share of the Available Cash (the "Initial Class 3 Distribution").  In addition, after the Initial Class 3 Distribution but prior to the Final Distribution Date, the Disbursing Agent shall, but is not required, to make Pro Rata Interim Distributions of Available Cash to the Holders of Allowed Class 3 Claims, when, in the discretion of the Liquidating Trustee, the Liquidating Trust has sufficient Available Cash to make such Interim Distributions.  Pro Rata distributions relating to Disputed Claims will be placed in the Disputed Claims Reserve.

Class 4 consists of the Indenture Trustee Claims, which claims are unsecured and contractually subordinate to unpaid Indenture Trustee Fees accrued prior to the Petition Date. Subject to the provisions of the Plan related to the payment of the Indenture Trustee Fees, each Holder of a Class 4 Claim shall be allocated a Pro Rata share of each Distribution available to Holders of Class 3 Claims; provided, however, that the amount of distributions to Holders of Allowed Class 4 Claims shall first be paid on account of unpaid Indenture Trustee Fees accrued prior to the Petition Date, in an amount estimated to be $595.  The payment of pre-Petition Date Indenture Trustee Fees only impacts distributions made to holders of Class 4 Claims.  Post-Petition Date Indenture Trustee Fees shall be paid in accordance with Section II (B)(1)(b)(ii) of the Plan.

Class 4 Claims are unique unsecured claims in that (a) unlike Class 3 Claims, distributions to holders of Class 4 Claims are subject to and contractually subordinate to the Indenture Trustee Fees; (b) the interests of the numerous claimants in Class 4 are linked together and governed by the documents pursuant to which the Debentures were issued; (c) their interests are served by the Indenture Trustees; (d) there is a public market for the trading of their claims; and (e) their claims are accorded a specific rate of interest. No other creditors share these characteristics.[11]

Based upon the Debtor's estimate of the total (a) General Unsecured Claims in Class 3 and (b) the Indenture Trustee Claims in Class 4, and the Debtor's estimate of the Available Cash, the Debtor estimates that holders of Allowed Claims in Classes 3 and 4 will receive a percentage recovery of approximately 0.20 % of the face amount of their Allowed Claims.[12]   The actual percentage recovery will vary depending upon, among other things, the actual amount of Allowed Claims and the actual amount of Available Cash realized, such that the actual recovery may be different than the Debtor's estimate.  Based upon the Debtor's estimates, the Available Cash is not sufficient to pay the Allowed Class 3 Claims and Allowed Class 4 Claims in full. See Exhibit "B" to this Disclosure Statement.

Holders of Allowed HWFG Preferred Stock Interests and HWFG Common Stock Interests in Classes 5 and 6 are junior in priority to Allowed Class 4 Claims and will not receive a distribution under the Plan unless and until the Holders of Allowed Class 4 Claims are paid in full. Since no distribution is expected to be made on account of Allowed Class 5 Claims and Allowed Class 6 Claims, Allowed HWFG Preferred Stock Interests and Allowed HWFG Common Stock Interests in Classes 5 and 6 respectively will be deemed to receive nothing on account of their interests under the Plan, and such HWFG Preferred Stock Interests and HWFG Common Stock Interests will be deemed cancelled upon confirmation of the Plan.

---

[11]      The number of creditors voting in Class 4 far outnumber the voting creditors in Class 3.  The Debtor does not know the identity of the beneficial claimants in Class 4 and communicates with them through two Indenture Trustees. The Debtor understands that the beneficial holders of the TRUPs are Collateral Debt Obligations and that the debt instruments continue to be publicly traded.
[12]      This estimate does not take into account any proceeds of, or costs of recovery of,  Estate Causes of Action, including without limitation Tax Refund and state tax refund claims, avoidance claims arising under Chapter 5 of the bankruptcy Code or costs of distribution, all of which remain unknown at this time.

THE SUMMARY OF THE PLAN SET FORTH HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH ARE CONTROLLING.  THE PLAN IS ATTACHED HERETO AS EXHIBIT "A", AND FORMS A PART OF THIS DISCLOSURE STATEMENT.

A.    **Summary of Certain Other Provisions of the Plan.**

1.    **Deadline for Filing Certain Administrative Tax Claims.**

Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, all requests for payment of Claims by a "governmental unit" (as defined under section 101(27) of the Bankruptcy Code) for Taxes (and for interest and/or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no bar date has otherwise been previously established, must be Filed on or before the later of: (a) sixty (60) days following the Effective Date; or (b) ninety (90) days following the filing of the tax return for such Taxes for such tax year or period with the applicable governmental unit.  Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any Holder of a Claim for Taxes is required to File a request for a payment of the post-petition Taxes and other monies due related to such Taxes.  Except as otherwise provided in Section 503(b)(1)(D) of the Bankruptcy Code and 28 U.S.C. § 960, any holder of a Claim for Taxes which does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Claim against any of the Estate, the Liquidating Agent or their respective property, whether any such Claim is deemed to arise prior to, on, or subsequent to the Effective Date, and shall receive no distribution under the Plan or otherwise on account of such Claim.

2.    **Executory Contracts and Unexpired Leases.**

Subject to the approval of the Bankruptcy Court, the Bankruptcy Code empowers the Debtor to assume, assume and assign, or reject executory contracts and unexpired leases.  As a general matter, an "executory contract" is a contract under which material performance remains due by each party.  If an executory contract or unexpired lease is rejected by the Debtor, the other party to the agreement may file a Claim for any damages incurred by reason of the rejection.  In the

29

case of rejection of employment agreements and leases of real property, such damage Claims are subject to certain limitations imposed by the Bankruptcy Code. If an executory contract or unexpired lease is assumed, the debtor generally has the obligation to perform its obligations thereunder in accordance with the terms of such agreement. If an executory contract is assumed and assigned, the assignee generally has the obligation to perform the obligations of the debtor thereunder in accordance with the terms of such agreement.

Section VII of the Plan discusses the assumption and rejection of executory contracts in further detail. Executory contracts and unexpired leases to be assumed pursuant to the Plan and the projected Cure Payments, if any, are listed in Exhibit "1" to the Plan. The procedures for disputing a Cure Payment or objecting to the assumption of such executory contracts or unexpired leases are discussed in further detail in Section VII.B of the Plan. The Debtor reserves the right to delete any contract or lease from Exhibit "1" to the Plan, thereby rejecting the contract or lease, up to and including the hearing on confirmation of the Plan, by filing with the Bankruptcy Court an amended Exhibit "1" to the Plan and by giving notice to counsel for the Indenture Trustee and counsel for the non-debtor party to the contract or lease.

All executory contracts and unexpired leases which have not previously been rejected, which are not specifically assumed, either pursuant to the Plan or by separate order in the Chapter 11 Case, or which are not the subject of a motion to assume pending on the Effective Date, are deemed rejected pursuant to the Plan as of the Effective Date (or as of such earlier date as announced by the Debtor at the Confirmation Hearing). Exhibit "2" to the Plan contains a nonexclusive list of executory contracts and unexpired leases to be rejected under the Plan. Section VII.D sets forth the procedures for filing a Claim arising from the rejection of an executory contract or unexpired lease.

All Allowed Claims arising from the rejection of executory contracts or unexpired leases, whether under the Plan or by separate proceeding, will be treated as Allowed Class 3 Claims under the Plan.

3.     **Means of Implementation of the Plan.**

(a)     **From the Confirmation Date to the Effective Date.**

Although the Plan will become effective only on the Effective Date, on and after the Confirmation Date and until the Effective Date, the Debtor shall take or cause to be taken all actions which are necessary or appropriate to enable the Plan to become effective on the Effective Date and to implement and perform the Plan on and after the Effective Date.

(b)     **Establishment of the Liquidating Trust.**

On the Effective Date, the Debtor, on behalf of the Estate, and the Liquidating Trustee will be authorized and directed to, and will execute the Liquidating Trust Agreement in substantially the form attached as Exhibit "3" to the Plan. The Liquidating Trust is organized and established as a trust for the benefit of the Beneficiaries and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).

In accordance with Treasury Regulation Section 301.7701-4(d), the Beneficiaries of the Liquidating Trust will be the Holders of all Allowed Claims against and, to the extent Allowed Claims are paid in full with interest, Allowed Equity Interests in the Debtor. The Holders of Allowed Claims will receive an allocation of the Liquidating Trust Assets as provided for in the Plan and the Liquidating Trust Agreement. The Beneficiaries of the Liquidating Trust shall be treated as the grantors and owners of such Beneficiaries' respective portion of the Liquidating Trust.

(c)     **Vesting and Transfer of Debtor's Assets.**

Unless otherwise expressly provided under the Plan, on the Effective Date, pursuant to the Plan and sections 1123, 1141 and 1146(a) of the Bankruptcy Code, the Debtor is authorized and directed to transfer, grant, assign, convey, set over, and deliver to the Liquidating Trustee all of the Debtor's and its Estate's right, title and interest in and to its Assets, including all Estate Causes of Action, free and clear of all liens, Claims, encumbrances or interests of any kind in such property, except as otherwise expressly provided in the Plan. To the extent required to implement the transfer of the Debtor's Assets from the Debtor and its Estate to the Liquidating Trust, all Persons

31

will cooperate with the Debtor and its Estate to assist the Debtor and its Estate to implement said transfers.

### (d)    Implementation of the Liquidating Trust.

From and after the Effective Date, the Liquidating Trustee will be authorized to, and will take all such actions as required, to implement the Liquidating Trust Agreement and the provisions of the Plan as are contemplated to be implemented by the Liquidating Trustee, including, without limitation, directing Distributions to Holders of Allowed Claims, objecting to Claims, prosecuting or otherwise resolving Estate Causes of Action, causing Distributions from the Liquidating Trust to be made to the Beneficiaries and establishing any reserves necessary to satisfy payments required under the Plan. The Liquidating Trustee may use, acquire and dispose of property of the Liquidating Trust free of any restrictions imposed under the Bankruptcy Code. This section is a summary of pertinent provisions of the Liquidating Trust Agreement. You are urged to review the Liquidating Trust Agreement in its entirety. The Liquidating Trust Agreement is the operative governing document and nothing contained herein shall in any way modify, supplement or supersede the provisions within the Liquidating Trust Agreement.

### (i)    Representative of the Estate.

The Debtor will select the person to be appointed as the Liquidating Trustee, provided, however, such person shall be reasonably satisfactory to the Indenture Trustees. The Debtor will disclose the identity of the Liquidating Trustee prior to the Confirmation Hearing. The Liquidating Trustee will be appointed as the representative of the Estate pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to the Liquidating Trust Agreement) to *inter alia*: (i) object to Claims against and Equity Interests in the Debtor; (ii) administer, investigate, prosecute, settle and abandon all Estate Causes of Action assigned to the Liquidating Trust; (iii) make Distributions provided for in the Plan, including, but not limited to, on account of Allowed Claims; and (iv) take such action as required to administer, wind-down, and close the Chapter 11 Case. As the representative of the Estate, the Liquidating Trustee will be vested with all of the rights and powers of the Debtor and its Estate with respect to all Estate Causes of Action assigned and transferred to the Liquidating Trust, and

the Liquidating Trustee will be substituted in place of the Debtor and/or its Estate, as applicable, as

the party in interest in all such litigation pending as of the Effective Date.

### (ii)    No Liability of Liquidating Trustee.

To the maximum extent permitted by law, the Liquidating Trustee, its employees, officers,

directors, agents, members, or representatives, or professionals employed or retained by the

Liquidating Trustee (the "Liquidating Trustee's Agents"), and their employees, officers, directors,

agents, members, or representatives, or professionals employed or retained, will not have or incur

liability to any Person for an act taken or omission made in good faith in connection with or related

to the administration of the Liquidating Trust Assets, the implementation of the Plan and the

Distributions made thereunder or Distributions made under the Liquidating Trust Agreement.  The

Liquidating Trustee, the Liquidating Trustee's Agents and their employees, officers, directors,

agents, members, or representatives, or professionals employed or retained will in all respects be

entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities

under the Plan and the Liquidating Trust Agreement.  Entry of the Confirmation Order constitutes a

judicial determination that the exculpation provision contained in Section X.A of the Plan is

necessary to, *inter alia*, facilitate confirmation and feasibility and to minimize potential claims

arising after the Effective Date for indemnity, reimbursement or contribution from the Estate or the

Liquidating Trust.  The Confirmation Order's approval of the Plan will also constitutes a *res

judicata* determination of the matters included in the exculpation provisions of the Plan.

Notwithstanding the foregoing, nothing herein or in Section X.A of the Plan will alter any

provision in the Liquidating Trust Agreement that provides for the potential liability of the

Liquidating Trustee to any Person.

### (iii)    Prosecution of Estate Causes of Action by the Liquidating Trustee.

Pursuant to the Confirmation Order, on the Effective Date, the Debtor irrevocably assigns,

transfers and conveys to the Liquidating Trust all property of the Estate, including, but not limited

to, all Estate Causes of Action.  Subject to the provisions of Section V.B.4 of the Plan, the

Liquidating Trustee shall have the power and authority to prosecute, compromise or otherwise

resolve any and all such Estate Causes of Action, with all recoveries derived therefrom to be included within Available Cash.

Therefore, the Estate Causes of Action described in Exhibit "E" (potential preference payments), Exhibit "F" (litigation against third parties) and the pending litigation claims described on Exhibit "D", if any, will be investigated and may be prosecuted by the Liquidating Trustee thereafter. Additionally, the Liquidating Trustee will investigate and may object to Claims after the Effective Date. The Debtor and its Professional Persons have made a diligent effort to identify in Exhibits "D," "E" and "F" to this Disclosure Statement, all potential Estate Causes of Action (other than objections to Claims). However, no reliance should be placed on the fact that a particular Estate Cause of Action is or is not identified in Exhibits "D," "E", or "F". The Liquidating Trustee may seek to investigate, file and prosecute Estate Causes of Action after the Effective Date of the Plan, whether or not the Estate Causes of Action are identified in the Disclosure Statement.

Neither the Debtor nor the Liquidating Trustee waives, relinquishes, or abandons any right or cause of action which constitutes property of the Debtor's Estate, whether or not such right or cause of action has been listed or referred to in the Schedules or in this Disclosure Statement and whether or not such right or cause of action is currently known to the Debtor or the Liquidating Trustee. The Debtor submits that the reservation of Estate Causes of Action herein is sufficient to preserve such Estate Causes of Action and shall not give rise to any release, waiver, extinguishment, forfeiture or other impairment of any Estate Cause of Action against any party, nor shall same subject the Estate or the Liquidating Trustee to any claims or defenses of *res judicata*, equitable estoppel or any other similar doctrines or theories in connection with any of the Estate Causes of Action.

**(e)   Issuance and Execution of Plan Related Documents and Corporate Action.**

Pursuant to Section V.D of the Plan, as of the Effective Date, the Liquidating Trustee will be authorized to execute such amendments, modifications, supplements, and other documents as provided for in the Plan. From and after the Effective Date, the Debtor shall be dissolved and the

1   Liquidating Trustee shall be authorized to take all action necessary to dissolve the Debtor.  On the

2   Effective Date, the employment, retention, appointment and authority of all Officers, Directors,

3   Employees and Professionals of the Debtor shall be deemed to terminate.

4                    **(f)        Cancellation/Surrender of Debentures and Related Agreements.**

5               As of the Effective Date the Indentures, Debentures, Declaration of Trusts, Guarantee

6   Agreements, Debenture Subscription Agreements, Capital Securities Agreement, Purchase

7   Agreement, and Common Securities Agreements (collectively, the "Trust Related Agreements")

8   shall be terminated.  Notwithstanding the foregoing, the Trust Related Agreements shall continue

9   in effect solely for purposes of (i) allowing the Indenture Trustees to receive Distributions under

10  the Plan on behalf of the Holders of Allowed Class 4 Claims; (ii) thereafter, allowing the Indenture

11  Trustees to make distributions to Holders of Allowed Class 4 Claims; and (iii) permitting the

12  Indenture Trustees to maintain any rights and charging liens they may have against property held

13  or collected by the Indenture Trustees for reasonable fees, costs and expenses pursuant to the

14  Indentures, or for indemnification as provided for under the Indentures.  The Trust Related

15  Agreements shall terminate completely upon completion of all distributions by the Indenture

16  Trustees to the Holders of Allowed Class 4 Claims.

17              Following the Effective Date, Holders of Allowed Class 4 Claims will receive from the

18  Indenture Trustees or their designee(s) specific instructions regarding the time and manner in

19  which the Debentures are to be surrendered.  Pending such surrender, such Debentures will be

20  deemed cancelled and shall represent only the right to receive the Distributions to which the Holder

21  is entitled under this Plan.  Any such Holder who fails to surrender or cause to be surrendered such

22  Debenture or fails to execute and deliver an affidavit of loss and indemnity reasonably satisfactory

23  to the Disbursing Agent or the respective Indenture Trustee, agent or servicer, as the case may be,

24  within six (6) months after the Effective Date, shall be deemed to have forfeited all rights and

25  claims in respect of such Debenture and shall not participate in any distribution hereunder, and all

26  cash in respect of such forfeited distribution, including interest accrued thereon, shall revert to

27  Distributions to be made to other Holders of Debentures.

28

Provision for Allowance of the Claims Asserted by the Indenture Trustee On Behalf of the Indenture Trustee Claims.

As set forth in further detail in Section IV.A. of the Plan, a beneficial owner of the Debentures of record as of June 1, 2011 (the "Record Date") shall, for purposes of voting on the Plan and distributions under the Plan, be deemed to have an Allowed Class 4 Claim for the outstanding principal amount of the Debentures owned by such beneficial owner plus accrued and unpaid interest as of the Petition Date, and need not file a proof of claim with respect thereto.

With respect to distributions to be made to Holders of Allowed Class 4 Claims, the Indenture Trustee shall (i) be the Disbursing Agent, (ii) receive the consideration to be paid to Holders of the Debentures which are classified as Allowed Class 4 Claims; (iii) be solely responsible for making distributions to Holders of Allowed Class 4 Claims arising from such Debentures; and (iv) be authorized to deduct the Indenture Trustee's Fees from the consideration provided to holders of Allowed Class 4 Claims to the extent so provided for in the Indentures.

### 4.    Resolution of Disputed Claims.

As set forth in Section V of the Plan, after the Effective Date and subject to the provisions of the Plan and Liquidating Trust Agreement, the Liquidating Trustee will review all Claims and determine if any grounds exist to object to such Claims. Only Allowed Claims will be paid. Distributions relating to Disputed Claims will be placed into the Disputed Claims Reserve until such time as such Disputed Claim is adjudicated or otherwise settled. The Liquidating Trustee may establish more than one Disputed Claim Reserve to ensure payment as required under the Plan. For example, if any Priority Tax Claim is a Disputed Claim on the Effective Date, the Liquidating Trustee is authorized to establish a separate Disputed Claim Reserve for such Priority Tax Claim to ensure, pursuant to the Plan, that sufficient funds are available to satisfy such claim to the extent it becomes an Allowed Claim. Any Disputed Claim that becomes an Allowed Claim after the Effective Date will be paid from the Disputed Claims Reserve. If such Disputed Claim fails to become an Allowed Claim, money placed in the Disputed Claims Reserve on behalf of such Disputed Claim shall be deemed to be Available Cash and shall be distributed to holders of Allowed Class 3 Claims, and if appropriate under the Plan, Allowed Class 4 Claims. All

objections to claims shall be filed prior to the Liquidating Trustee Claim Objection Deadline, as

defined in I.A of the Plan, and served upon the Holder of the Claim to which the objection is made.

Additionally, any Claims filed by the Debtor's officers and directors seeking

indemnification from the Debtor pursuant to employment agreements, by-laws or otherwise, shall

be channeled, subject to any defenses thereto and 11 U.S.C. 510(b) and (c), to the Debtor's

applicable directors' and officers' insurance policies including but not limited to: St. Paul Mercury

Insurance, Policy No. EC08500090 and XL Insurance, Policy No. ELU118152-10.

### 5. Distributions Under the Plan.

#### (a) General Provisions.

Except as otherwise provided herein, or as may be ordered by the Bankruptcy Court,

distributions to be made on the Effective Date on account of Allowed Claims, other than Allowed

Class 3 Claims and Allowed Class 4 Claims, shall be made on the Effective Date or as soon as

practicable thereafter.  Each Holder of an Allowed Class 3 Claim shall receive an Initial Class 3

Distribution, as soon as practicable in the discretion of the Liquidating Trustee, comprising a Pro

Rata Share of the Available Cash.  Each Holder of an Allowed Class 4 Claim shall be allocated a

Pro Rata share of each Distribution available to Holders of Class 3 Claims; provided, however, that

the amount of distributions to Holders of Allowed Class 4 Claims shall first be paid on account of

unpaid Indenture Trustee Fees accrued prior to the Petition Date.

Notwithstanding the foregoing, no distributions will be made on a Claim unless it is an

Allowed Claim or, in the case of a Disputed Claim, an order of the Bankruptcy Court has been

entered estimating the Claim for purposes of distribution; and, provided, further, however,

distributions on Allowed Claims may be delayed as a result of, or the allowance or estimation of,

Disputed Claims, or the expiration of time for filing a proof of claim.

#### (b) Delivery of Distributions, Address of Holder.

For purposes of all notices and distributions under the Plan, and except as provided in

Section 4 above, the Liquidating Trustee shall be entitled to rely on the name and address of the

Holder of each Claim as shown on, and distributions to Holders of Allowed Claims shall be made

by regular U.S. first class mail to, the following addresses: (a) at the addresses set forth in the