1  RODGER M. LANDAU (State Bar No. 151456)
   SHARON M. KOPMAN (State Bar No. 164449)
2  LANDAU GOTTFRIED & BERGER LLP
   1801 Century Park East, Suite 1460
3  Los Angeles, California 90067
   Telephone: (310) 557-0050
4  Facsimile: (310) 557-0056
   rlandau@lgbfirm.com
5  skopman@lgbfirm.com

6  Counsel for Debtor and Debtor In
   Possession

7

                    UNITED STATES BANKRUPTCY COURT
8
               FOR THE CENTRAL DISTRICT OF CALIFORNIA
9
                          NORTHERN DIVISION
10

11

12  In re                              Bk. No. 9:10-bk-14677-RR

13  HARRINGTON WEST FINANCIAL GROUP,   Chapter 11
    INC.,
14                                     DEBTOR HARRINGTON WEST
              Debtor and Debtor In     FINANCIAL GROUP, INC.'S STATUS
15            Possession.              REPORT REGARDING SOLICITATION
                                       AND CONFIRMATION OF DEBTOR'S
16                                     FIRST AMENDED PLAN OF LIQUIDATION
                                       AND RESPONSE TO THE FEDERAL
17                                     DEPOSIT INSURANCE CORPORATION'S
                                       OBJECTION;  DECLARATIONS OF KERRY
18                                     STEELE AND SHARON M. KOPMAN IN
                                       SUPPORT THEREOF
19
                                       Confirmation Hearing:
20
                                       Date:   September 14, 2011
21                                     Time:   11:00 a.m.
                                       Place:  Courtroom 201
22                                             1415 State Street
                                               Santa Barbara, CA 93101-2511
23

24

25

26

27

28

LANDAU
GOTTFRIED &
BERGER LLP

1  **TO THE HONORABLE ROBIN L. RIBLET, UNITED STATES BANKRUPTCY JUDGE**

2  **AND ALL INTERESTED PARTIES:**

3      Debtor and Debtor in Possession Harrington West Financial Group, Inc. ("Debtor") submits

4  this pleading (the "Response") (a) as a status report on the outcome of Debtor's solicitation efforts

5  on its First Amended Plan of Reorganization ("Plan"); (b) to advise the Court on the current status of

6  Debtor's negotiations with creditors and the Debtor's position regarding proposed next steps in this

7  Bankruptcy Case; and (c) to respond to the objection to the Plan ("Objection") filed by the Federal

8  Depository Insurance Corporation ("FDIC-R") as receiver of Los Padres Bank, FSB (the "Bank").[1]

9  The Debtor has also filed a Plan Ballot Summary as required by Local Bankruptcy Rule 3018-1.

10  (Docket No. 86).

## STATUS REPORT ON SOLICITATION PROCESS

12      The Debtor is disappointed to inform the Court that it does not have a confirmable Plan as of

13  the date this Response is filed. There were two impaired classes of claims in the Plan that were

14  entitled to vote:  Class 3 and Class 4.  As reflected in the Plan Ballot Summary, in Class 3, only two

15  creditors voted on the Plan.  One creditor, American Stock Transfer Company, voted to accept the

16  Plan.  The other, the FDIC-R, which was allowed to vote $1.00 due to the contingent, unliquidated

17  nature of its claim, voted to reject the Plan.

18      The Debtor was blind-sided by the FDIC-R Objection and rejection of the Plan.  Until such

19  Objection was filed, the Debtor believed that Class 3 would be an impaired consenting class and that

20  if necessary, the Plan could be confirmed under § 1129(b) of the Bankruptcy Code if Class 4 rejected

21  the Plan or failed to vote.  The FDIC-R's counsel notified the Debtor's counsel on the August 24,

22  2011 Voting Deadline and Objection Deadline that it had been instructed by its client to file an

23  Objection and to reject the Plan.  *See* Exhibit "4" attached to the Declaration of Sharon M. Kopman

24  ("Kopman Declaration") annexed hereto and filed in support of this Response.  The issues in the

25  FDIC Objection were not previously raised with the Debtor.  The Debtor had believed that, because

26  it had already made revisions to the Disclosure Statement and Plan requested by the FDIC-R in

27  connection with the Disclosure Statement Hearing (as reflected on the record of the Disclosure

28

---

[1]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Statement Hearing) and in the Supplement filed in support of Debtor's Disclosure Statement (Docket No. 61), the FDIC-R was content with the Plan. *See* Declaration of Kerry Steele ("Steele Declaration") annexed hereto and filed in support of this Response.

With respect to Class 4, only one creditor voted and that creditor voted to reject the Plan. *See* Plan Ballot Summary. The other owners of trust originated preferred securities ("TRUPs") in Class 4 that were entitled to vote elected not to submit ballots. The rejection by the TRUP holder that did vote, Holdco Advisors L.P., as manager for Tricadia CDO Management, LLC, Financials Restructuring Partners, Ltd., Financials Restructuring Partners II, Ltd., and Tricadia Financials Restructuring Partners, Ltd. ("Holdco"), was not a surprise because the Debtor has been communicating with Holdco and its counsel, Duane Morris, LLP, over the last few months and understands that Holdco is interested in filing its own plan. *See* Steele Declaration. Holdco has indicated to the Debtor that Holdco's proposed plan would be an equitization plan, one that Holdco claims would potentially bring additional assets into the Estate for the benefit of creditors. The Debtor has advised Holdco that it would be willing to review and consider any plan that it files but such filing must be done quickly. Conceptually, the equitization plan Holdco proposes sounds confirmable; however, the Debtor cannot take a position until it reviews such plan as filed.

## CURRENT STATUS OF NEGOTIATIONS/NEXT STEPS

The Debtor has made every effort to march forward and administer its case as quickly and efficiently as possible. Approximately one (1) year has passed since the Petition Date (September 10, 2010). The Debtor still believes its liquidating Plan is in the best interests of the Debtor's Estate and all its creditors. However, the FDIC-R and Holdco are fighting over their own respective issues and have their own agendas. *See* Steele Declaration. If the Debtor is able to reach a consensual resolution such that the Plan becomes confirmable, the Debtor reserves all of its rights to file further evidence and pleadings in support of its Plan, as may be amended from time to time.

The Debtor has been and is continuing to attempt to consensually resolve issues with the FDIC-R as reflected in the response to the FDIC-R Objection below. The Debtor believes all the proposed changes to address the FDIC-R Objection are non-material changes to the existing Plan. As of the filing of this Response, the FDIC-R is unwilling to negotiate and has advised the Debtor

that it will likely seek conversion of the Bankruptcy Case to a Chapter 7. *See* Steele Declaration.

The Debtor has also been communicating with Holdco and its counsel. The Debtor has advised Holdco that if it (a) supports the current Plan and changes its vote or (b) *immediately* files its Plan, and the Debtor views the filed Plan as confirmable, the Debtor may support a brief continuance if requested by Class 4. With respect to (b), the Debtor is willing to support a confirmation hearing on a shortened timeline, as approved by the Bankruptcy Court, and to facilitate the process as much as possible. The Debtor believes the proposed Holdco Plan that Holdco has shared with the Debtor would be preferable to a conversion if such Plan is promptly filed since if the Bankruptcy Case were converted now, much of the momentum and institutional knowledge relating to the matters at issue in this case would be lost, to the detriment of creditors.

Accordingly, the Debtor's position is as follows: If the Debtor can confirm the current Plan by reaching a deal with the FDIC-R or Class 4 and a brief continuance is necessary to confirm the Plan, the Debtor would support a continuance if the Court is willing to grant such request. If Class 4 files a confirmable plan by September 14th and requests a continuance, the Debtor likely would support that as well.[2] If no one comes to the table on the current Plan and Class 4 continues to seek a continuance without filing a plan, the Debtor sees no purpose in continuing the case merely in the hope that things will change.

Administrative Expenses continue to accrue daily and the Debtor's Cash Flow Projection reflects approximately $100,000 in Cash available as of the proposed Effective Date of its Plan (September 2011). *See* Exhibit "3" to the Plan Supplement (Docket No. 75). The Debtor is solely interested in taking a course of action that is in the best interests of the Debtor and its creditors, and if no confirmable chapter 11 plan emerges promptly, continued delay would only occasion an unnecessary expenditure of the Estate's limited resources, and would not best serve those interests. If conversion is the only viable option, the Debtor would request that the Court allow interim fee applications to be filed to pay the Chapter 11 administrative expenses *pro rata* such that $100,000 remains in the Estate for the Chapter 7 trustee to use to administer the case. This is the same amount

---

[2]   The Debtor would request that Holdco be required to keep a tight timeline to solicit and seek confirmation of such a plan.

LANDAU
GOTTFRIED &
BERGER LLP

1    of funds that would have been available to the Liquidating Trustee if the Debtor's Plan were

2    confirmed. *See* Steele Declaration.

3                                **RESPONSE TO FDIC OBJECTION**

4            With respect to the FDIC Objection, the Debtor responds as follows:

5            1)      FDIC-R DOES NOT HAVE A SENIOR CLAIM:  Why the FDIC-R waited until now

6    to raise this argument with the Debtor is mystifying in light of the Debtor's demonstrated

7    willingness to engage with the FDIC-R in the plan process, and to address the FDIC-R's concerns

8    when raised.  For the first time in this case, the FDIC-R argues in its Objection that some portion of

9    its Class 3 claim – mainly as it relates to the approximately $9 million dollar Tax Refund sought

10   from the Internal Revenue Service - is senior to the Holders of Claims in Class 4 (the TRUP

11   holders).  The FDIC-R bases its argument  on section 15.01 in the Indentures, which provides that

12   debt under the Indentures is subordinated to "Senior Indebtedness" as defined in the Indentures. *See*

13   Exhibit "1" to the Kopman Declaration (Section 15.01 in the Indentures).  The problem is that the

14   FDIC-R has failed to produce any evidence supporting its claim that it is "Senior Indebtedness,"

15   which is defined in the Indentures as follows:

16                  [M]eans with respect to the [Debtor]  (i) the principal, premium, if any,

17                  and interest in respect of (A) indebtedness of the [Debtor] for money

18                  borrowed and (B) indebtedness evidenced by securities, debentures,

19                  notes, bonds or other similar instruments issued by the [Debtor], (ii) all

20                  capital lease obligations of the [Debtor], (iii) all obligations of the

21                  [Debtor] issued or assumed as the deferred purchase price of property,

22                  all conditional sale obligations of the [Debtor] and all obligations of the

23                  [Debtor] under any title retention agreement (but excluding trade

24                  accounts payable arising in the ordinary course of business). . . . .

25   *See* Exhibit "2" to the Kopman Declaration (the "definition of "Senior Indebtedness" in the

26   Indentures).  The list goes on with examples of the typical secured creditor.

27           The Debtor has not borrowed funds from its wholly-owned subsidiary, the Bank, but to the

28   contrary, as reflected in the Debtor's Disclosure Statement, the Debtor down-streamed most, if not

LANDAU
GOTTFRIED &
BERGER LLP

5

all, the funds it raised to the Bank to keep the Bank adequately capitalized. (DS Section III A-C, pp. 11-20). *No loan agreement or other documentation evidencing any loan from the Bank to the Debtor exists.* Instead, the FDIC-R relies on an argument that treatment of whatever claim it may have to the Tax Refund as a loan is compelled by an *Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, issued by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC and the Office of Thrift Supervision, effective November 23, 1998 (the "Policy Statement"), a copy of which is appended as Exhibit "C" to the Declaration of John Kim filed in support of the FDIC-R Objection. That reliance, however, is entirely misplaced.

The FDIC-R's reliance on the Policy Statement to characterize the relationship between the Debtor, Holders of Class 4 Claims, and the FDIC-R for bankruptcy purposes erroneously expands the Policy Statement vastly beyond its stated scope. By its terms, the Policy Statement is intended solely to provide guidance as to how the agencies involved will carry out their oversight functions, not to provide a basis for subordinating third party claims. Section II of the Policy Statement explicitly defines that scope, providing that "[t]his *interagency policy statement* reiterates and clarifies the position *the Agencies will take as they carry out their supervisory responsibilities.*" Policy Statement, page 64757 (emphasis added). It thus has absolutely nothing to do with how third party claims – such as those of the TRUP Holders in Class 4 – are to be treated in this bankruptcy case, and the FDIC-R's arguments to the contrary are without merit. *See* Exhibit "3" to the Kopman Declaration (text of the Policy Statement highlighted for the Court).

This understanding of the limited regulatory nature of the Policy Statement is confirmed by the fact that such Policy Statement does not mandate treatment of tax transactions between parents (such as the Debtor) and bank subsidiaries as loans, but rather provides guidance that the regulators "may" "consider" certain tax transactions to be "extensions of credit" that "may be subject to affiliate transaction rules, i.e. Sections 23A and 23B of the Federal Reserve Act." Policy Statement, page 64758.

Moreover, the Policy Statement is precisely that – a policy statement of an agency. As such it is not law. The United States Supreme Court, rejecting a similar argument that legal reliance

1    should be placed on a Department of Labor opinion letter, noted in *Christensen v. Harris County*,

2    529 U.S. 567 (2000):

3    > Interpretations such as those in opinion letters -- like

4    > interpretations contained in *policy statements*, agency

5    > manuals, and enforcement guidelines, all . . . lack the force

6    > of law.

7    Id. at 587 (emphasis added); *see also, In re Seidman*, 37 F.3d 911, 931 - 932 (3d Cir. 1994) (OTS

8    statement of policy is not "regulation or law").

9      Based on the above, the FDIC-R's contention that its Class 3 Claim is senior to the Class 4

10    Claims is without merit and must be rejected.

11      Furthermore, as the FDIC-R admits in its Objection, its above arguments are "not at issue in

12    these Plan confirmation proceedings" (Objection p. 2, ¶¶ 16-17; p. 5, ¶¶14-24). The FDIC-R and

13    Debtor have always agreed that issues of ownership and allocation will pass through to the

14    Liquidating Trust and be handled by the Liquidating Trustee. The parties even stipulated, as

15    approved by the Bankruptcy Court by Order entered on August 8, 2011, to establishing an escrow

16    account for the Tax Refund for this reason. (Docket No. 74). The seniority argument that the FDIC-

17    R raises in its Objection should likewise pass through to the Liquidating Trust and be handled by the

18    Liquidating Trustee. While the Debtor believes the FDIC-R's arguments are meritless, the Debtor

19    has no problem reaffirming in the Confirmation Order that the Bankruptcy Code section 510(a) issue

20    regarding seniority/subordination as it relates to the Tax Refund and Class 4 can be reserved and be

21    resolved at a later date. Moreover, as a practical matter, the Tax Refund is the primary asset of the

22    Debtor's estate and until such time as those funds are released from the Escrow Account (which can

23    only happen once the ownership/allocation issues are resolved either consensually or by an Order

24    from a court of competent jurisdiction), there likely will not be any Distribution to creditors in

25    Classes 3 and 4. Accordingly, this issue is a non-issue at this time.

26      2) <u>THE DEBTOR COMMUNICATED WITH UNSECURED CREDITORS</u>

27    <u>REGARDING THE POTENTIAL LIQUIDATING TRUSTEE CANDIDATES</u>: The Plan provides

28    that the Debtor would select a liquidating trustee that was reasonably satisfactory to the Indenture

LANDAU
GOTTFRIED &
BERGER LLP

1    Trustees, which represent the largest unsecured creditors in the Bankruptcy Case. As reflected in the

2    Supplement, the Debtor did consult with and interview a candidate proposed by the Indenture

3    Trustees, who represent the largest unsecured creditor pool, but such candidate, for various reasons,

4    ultimately declined the liquidating trustee position. Contrary to the FDIC-R's assertions, the Debtor

5    also interviewed a candidate approved by the FDIC-R. As reflected in the Kopman Declaration, the

6    FDIC-R's counsel offered assistance if needed to talk to a candidate that the Debtor was

7    interviewing because the FDIC-R had a relationship with such candidate. The Debtor had already

8    commenced communications with such candidate and advised the FDIC-R that it appreciated the

9    overture but their involvement in the discussions was unnecessary at that time. Since the primary

10   asset of the Liquidating Trust is the Tax Refund and negotiations and potential litigation with the

11   FDIC-R over issues, including, but not limited to, ownership, allocation, etc., will need to be handled

12   by the Liquidating Trustee, it seems inappropriate for the FDIC-R to be selecting the Liquidating

13   Trustee. However, the Debtor made an effort to involve the FDIC-R's counsel as it viewed

14   appropriate. After selecting the Liquidating Trustee, the Debtor contacted the FDIC-R's counsel and

15   advised of the Debtor's final decision and advised the FDIC-R's counsel to call with any questions.

16   The FDIC-R never called but instead objected to the Liquidating Trustee in the Objection without

17   ever explaining why. The proposed Liquidating Trustee, Ivan Kallick, Esq., has substantial

18   experience in dealing with the aforementioned issues and is currently involved in two bank holding

19   cases, having served as special counsel in *In re Vineyard National Bancorp,* Chapter 11 Case No.

20   6:09-26401-RN, pending before the United States Bankruptcy Court for the Central District of

21   California, Riverside Division; and *In re FirstFed Financial Corporation*, Chapter 11 Case No.

22   2:10-bk-12927-ER, which is also pending in this District, in the Los Angeles Division. *See* Kopman

23   Declaration.

24       3)       THE DEBTOR IS WILLING TO REMOVE THE INJUNCTION LANGUAGE IN

25   SECTION X.B OF THE PLAN. The FDIC-R objects to Section X.B of the Plan because it believes

26   it grants the Debtor a discharge in violation of section 1141(d)(3) of the Bankruptcy Code. Section

27   X.C. of the Plan clearly states that the Debtor is not receiving a discharge pursuant to section

28   //

LANDAU
GOTTFRIED &
BERGER LLP

1    1141(d)(3) of the Bankruptcy Code.  The Debtor agrees to delete Section X.B. of the Plan to ensure

2    there is no inconsistency with section 1141(d)(3).

3        4)    RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT IS

4    APPROPRIATE.  Section IX of the Plan provides that the Bankruptcy Court has exclusive

5    jurisdiction over any proceeding (i) arising under the Bankruptcy Code or (ii) arising in or related to

6    the Chapter 11 Case or the Plan and examples are provided in sections (A) through (P) under Section

7    IX.  Notwithstanding anything in Section IX, the Debtor's intent is not to affect the FDIC-R's right

8    or any other party's rights, to be allowed to assert that the Bankruptcy Court does not have exclusive

9    jurisdiction of any matter or proceeding or that a matter is a non-core proceeding or that any

10   reference of such matter to the bankruptcy court should be withdrawn.  The Debtor believes an

11   interested party would always have the right to make these arguments.  The Debtor is willing to

12   include a provision in the Confirmation Order that confirms this point.

13       5)    THE INDENTURE TRUSTEE FEES ARE PROPERLY TREATED AS

14   ADMINISTRATIVE CLAIMS UNDER THE PLAN:  Section II.B.1(b)(ii) of the Plan provides the

15   Indenture Trustees with an Administrative Claim for post-petition fees and expenses and post-

16   effective date fees and expenses. The Debtor, for the reasons below, believes the Indenture Trustees

17   are properly treated as Administrative Claims under the Plan, however, creditors, including the

18   FDIC-R may object to such Claims pursuant to the procedures established in the Plan.  Invoices of

19   the Indenture Trustees for post-petition fees and expenses must be submitted by the Administrative

20   Expense Claims Bar Date to the Liquidating Trustee and are subject to review by the Bankruptcy

21   Court if an objection to such post-petition fees is lodged.  The same procedure applies for post-

22   Effective Date fees and expenses of the Indenture Trustees.

23       The Liquidating Trustee is a fiduciary to all Beneficiaries of the Liquidating Trust, and the

24   Plan provides that if he receives an objection to any of the Indenture Trustees' fees, such objection

25   will be resolved by the Bankruptcy Court. Accordingly, the FDIC-R can advise the Liquidating

26   Trustee that it wishes to review any invoices of the Indenture Trustees and after such review, may

27   object to such fees and thus have the Bankruptcy Court review the same.

28   //

LANDAU
GOTTFRIED &
BERGER LLP

1    Contrary to the FDIC-R's assertions, the Indenture Trustees have been active in the Debtor's

2  Bankruptcy Case.  The Indenture Trustees represent the largest unsecured creditors in this

3  Bankruptcy Case and the Debtor deemed it important to have open lines of communications and to

4  involve counsel for the Indenture Trustees throughout the Bankruptcy Case in an effort to reach a

5  consensual Plan.  Despite the fact that the Indenture Trustees' constituents have voted to reject the

6  Plan, the Debtor believes that such communications and involvement has allowed the Bankruptcy

7  Case to be administered as smoothly and efficiently as possible.

8    With respect to post-effective date fees, under the Plan the Indenture Trustees are acting as

9  the Disbursing Agent for the Class 4 Claim Holders and will be communicating and strategizing

10  with the Liquidating Trustee on behalf of such Class 4 Claim Holders in connection with, among

11  other things, any resolution of the Tax Refund issues. Accordingly, the Debtor believes the Indenture

12  Trustee Fees are properly treated as Administrative Claims.

13    Since the issues raised in the FDIC-R Objection can be easily be resolved with non-material

14  modifications to the existing Plan as set forth above, the Debtor believes that it is in the FDIC-R's

15  best interests to agree to change its vote to accept the Plan and withdraw its Objection.

16    **CONCLUSION**

17    The Debtor will continue its efforts up to and including the Confirmation Hearing to reach a

18  consensual resolution with the FDIC-R and/or Holdco.  If a consensual resolution cannot be reached,

19  the Debtor will support a course of action that is in the best interests of the Estate and its creditors as

20  set forth in this Response.

21

22

23

24

25

26

27

28

LANDAU
GOTTFRIED &
BERGER LLP

1    **DECLARATION OF KERRY STEELE**

2    I, KERRY STEELE, declare as follows:

3    1.      I have been the Chief Financial Officer of the Debtor for approximately seven years

4    (7) years. In my position as an officer of the Debtor I have worked extensively with the books and

5    records of the Debtor, including its financial statements and projections, business analyses and

6    reports, contracts and other legal documents, notes and correspondence. I have an intimate

7    familiarity with the Debtor's books and records.

8    2.      I am over 18 years of age. If called as witness, I could and would competently testify

9    from my own personal knowledge regarding matters set forth in this Declaration.

10    3.      I file this Declaration in support of the Debtor's *Status Report Regarding Solicitation*

11    *And Confirmation Of Debtor's First Amended Plan Of Liquidation And Response To The Federal*

12    *Deposit Insurance Corporation's Objection.*[1]

13    4.      As reflected by the record in this Bankruptcy Case, the Debtor has made every effort

14    to march forward and administer its case as quickly and efficiently as possible. Approximately one

15    (1) year has passed since the Petition Date (September 10, 2010). The Debtor believed, until receipt

16    of the FDIC-R Objection, that at least Class 3 would be an impaired consenting class and that if

17    necessary, the Plan could be confirmed under § 1129(b) of the Bankruptcy Code if Class 4 rejected

18    the Plan or failed to vote. The issues raised in the FDIC-R Objection were not previously raised

19    with the Debtor prior to the filing and because the Debtor already made the revisions to its Plan and

20    Disclosure Statement previously requested by the FDIC-R the Debtor believed the FDIC-R

21    supported its Plan. Why the FDIC-R waited to advise the Debtor of its position is still baffling to

22    both the Debtor and its counsel.

23    5.      The Debtor expected the rejection vote from Class 4 for the reasons set forth in the

24    Response. Holdco appears to be waiting to file its proposed equitization plan for some indeterminate

25    period of time.

26    6.      The Debtor still believes its liquidating Plan is in the best interests of the Debtor's

27    Estate and all its creditors, however, as set forth in detail in the Response, the FDIC-R and Holdco

28    _____

[1]       Capitalized terms used herein shall have the meanings ascribed to them in the Plan or Response, as applicable.

LANDAU
GOTTFRIED &
BERGER LLP

are fighting over their own respective issues and have their own agendas. The Debtor has been and is continuing to attempt to consensually resolve issues with the FDIC-R as reflected in the response to the FDIC-R Objection in the Response. The Debtor believes certain non-material modifications set forth in the Response can be made to the Plan to satisfy the concerns addressed in the FDIC-R Objection but to date, the FDIC-R is unwilling to negotiate and has advised the Debtor that it will likely seek conversion of the Bankruptcy Case to a Chapter 7.

7. The Debtor has also been communicating with Holdco and its counsel. The Debtor has advised Holdco that if it (a) supports the current Plan and changes its vote or (b) *immediately* files its Plan, and the Debtor views the filed Plan as confirmable, the Debtor may support a brief continuance if requested by Class 4. With respect to (b), the Debtor is willing to support a confirmation hearing on a shortened timeline, as approved by the Bankruptcy Court, and to facilitate the process as much as possible. As of the filing of this Declaration, the Debtor understands that Holdco wants to seek a continuance of the Confirmation Hearing but is unwilling to commit to doing either (a) or (b) above.

8. If the Debtor can confirm the current Plan by reaching a deal with the FDIC-R or Class 4 and a brief continuance is necessary to confirm the Plan, the Debtor would support a continuance if the Court is willing to grant such request. If Class 4 files a confirmable plan by September 14th and requests a continuance, the Debtor likely would support that as well. If no one comes to the table on the current Plan and Class 4 continues to seek a continuance without filing a plan, the Debtor sees no purpose in continuing the case merely in the hope that things will change.

9. Administrative Expenses continue to accrue daily and the Debtor's Cash Flow Projection reflects approximately $100,000 in Cash available as of the proposed Effective Date of its Plan (September 2011). The Debtor is solely interested in taking a course of action that is in the best interests of the Debtor and its creditors, and if no confirmable chapter 11 plan emerges promptly, continued delay would only occasion an unnecessary expenditure of the estate's limited resources, and would not best serve those interests.

10. If conversion is the only viable option, the Debtor requests that the Court allow interim fee applications to be filed to pay the Chapter 11 administrative expenses *pro rata* such that

1   $100,000 remains in the Estate for the Chapter 7 trustee to use to administer the case.  So as not to

2   incur the expense associated with fee applications, the Debtor's Professionals have waited to be paid

3   for several months while the case moved towards what the Debtor believed would be a successful

4   confirmation hearing in September.  The Debtor believes a fair balance can be struck such that

5   sufficient funds of $100,000 remains in the Estate while some, if not all, the Chapter 11 expenses are

6   paid.  This is approximately the same amount the Liquidating Trustee would have had to administer

7   the Liquidating Trust.

8        I declare under penalty of perjury under the laws of the United States that the foregoing is

9   true and correct.

10       Executed this 7th day of September, 2011 in Los Angeles, California.

11

12

13                              KERRY STEELE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SHARON M. KOPMAN

1.    I am an attorney duly licensed to practice law in the State of California, and duly admitted to practice before the United States Bankruptcy Court for the Central District of California. Except as otherwise stated, each of the facts contained in this declaration is based upon my personal knowledge and if called upon to do so, I could competently testify thereto.

2.    I file this Declaration in support of the Debtor's *Status Report Regarding Solicitation And Confirmation Of Debtor's First Amended Plan Of Liquidation And Response To The Federal Deposit Insurance Corporation's Objection.*[1]

3.    Attached hereto as <u>Exhibit "1"</u> is a true and correct copy of section 15.01 in both Indentures.

4.    Attached hereto as <u>Exhibit "2"</u> is a true and correct copy of the definition of "Senior Indebtedness" in both Indentures.

5.    Attached hereto as <u>Exhibit "3"</u> is a true and correct copy of the Policy Statement submitted by the FDIC-R with the provisions addressed in the Response highlighted for the Court's convenience.

6.    Attached hereto as <u>Exhibit "4"</u> is a true and correct copy of the email I received from John Kim at the Nossaman firm regarding filing the FDIC-R Objection on August 24, 2011.

7.    The FDIC-R claims unsecured creditors were not included in the selection process of the Liquidating Trustee. These claims are meritless for the reasons set forth in the Response. During a conversation between me and Mr. John Kim of Nossaman in approximately mid-July 2011, Mr. Kim advised me that the FDIC-R would like to be involved in the Liquidating Trustee selection process. Since the primary asset of the Liquidating Trust is the Tax Refund and negotiations and potential litigation with the FDIC-R over issues, including, but not limited to, ownership, allocation, etc., will need to be handled by the Liquidating Trustee, the Debtor deemed it inappropriate for the FDIC-R to be selecting the Liquidating Trustee. However, the Debtor made an effort to involve the FDIC-R's counsel as it viewed appropriate. In late July 2011, the Debtor did communicate with the FDIC-R's counsel regarding the potential Liquidating Trustees. During a call on or about July 26,

---

[1]    Capitalized terms used herein shall have the meanings ascribed to them in the Plan or Response, as applicable.

LANDAU
GOTTFRIED &
BERGER LLP

2011 with Mr. Kim, I advised him that the Debtor was communicating with a candidate proposed by the Indenture Trustees. During that discussion I advised Mr. Kim that the Debtor was also going to speak with two other candidates, one of which was Mr. Brad Sharp at Development Specialists. Mr. Kim advised me that his client would support Mr. Sharp as the Liquidating Trustee candidate because they had worked with him in prior cases. Mr. Kim advised me that he and his partner, Allan Ickowitz, would be willing to participate in communications with Mr. Sharp if I believed it would help. I advised Mr. Kim that we appreciated the overture, however, we were already in contact with Mr. Sharp and at that time did not deem it necessary. In early August 2011, the Debtor, after good faith, arm's length negotiations deemed Mr. Kallick as the appropriate candidate for Liquidating Trustee. I thereafter called Mr. Kim and left him a message stating that the Debtor had selected Mr. Kallick and the details would be set forth in the Plan Supplement (Docket No. 75) filed on August 10, 2011 and that if he had questions he could call me. I never received a call from Mr. Kim and did not learn of his client's objection to Mr. Kallick until the Objection was filed. Mr. Kallick has substantial experience in dealing with the aforementioned issues and is currently involved in two bank holding cases, having served as special counsel in *In re Vineyard National Bancorp,* Chapter 11 Case No. 6:09-26401-RN, pending before the United States Bankruptcy Court for the Central District of California, Riverside Division; and *In re FirstFed Financial Corporation*, Chapter 11 Case No. 2:10-bk-12927-ER, which is also pending in this District, in the Los Angeles Division.

       8.     The representations regarding the Indenture Trustees' involvement in the Bankruptcy Case as set forth in the Response are true and accurate to the best of my knowledge. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

        Executed this 7th day of September, 2011 in Los Angeles, California.

SHARON M. KOPMAN

Exhibit 1

HARRINGTON WEST FINANCIAL GROUP, INC.

as Issuer

INDENTURE

Dated as of September 25, 2003

WILMINGTON TRUST COMPANY

as Trustee

FLOATING RATE JUNIOR SUBORDINATED DEBT SECURITIES DUE 2033

NY1 5435411v4

holder on or after the respective due date (or Optional Redemption Date or Special Redemption Date (as the case may be)) specified in the Debt Securities.

ARTICLE XV

SUBORDINATION OF DEBT SECURITIES

Section 15.01     Agreement to Subordinate.

The Company covenants and agrees, and each holder of Debt Securities issued hereunder and under any supplemental indenture (the "Additional Provisions") by such holder's acceptance thereof likewise covenants and agrees, that all Debt Securities shall be issued subject to the provisions of this Article XV; and each holder of a Debt Security, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provisions.

The payment by the Company of the payments due on all Debt Securities issued hereunder and under any Additional Provisions shall, to the extent and in the manner hereinafter set forth, be subordinated and junior in right of payment to the prior payment in full of all Senior Indebtedness of the Company, whether outstanding at the date of this Indenture or thereafter incurred.

No provision of this Article XV shall prevent the occurrence of any default or Event of Default hereunder.

Section 15.02     Default on Senior Indebtedness.

In the event and during the continuation of any default by the Company in the payment of principal, premium, interest or any other payment due on any Senior Indebtedness of the Company following any applicable grace period, or in the event that the maturity of any Senior Indebtedness of the Company has been accelerated because of a default, and such acceleration has not been rescinded or canceled and such Senior Indebtedness has not been paid in full, then, in either case, no payment shall be made by the Company with respect to the payments due on the Debt Securities.

In the event that, notwithstanding the foregoing, any payment shall be received by the Trustee when such payment is prohibited by the preceding paragraph of this Section, such payment shall, subject to Section 15.06, be held in trust for the benefit of, and shall be paid over or delivered to, the holders of Senior Indebtedness or their respective representatives, or to the trustee or trustees under any indenture pursuant to which any of such Senior Indebtedness may have been issued, as their respective interests may appear, but only to the extent that the holders of the Senior Indebtedness (or their representative or representatives or trustee) notify the Trustee in writing within 90 days of such payment of the amounts then due and owing on the Senior Indebtedness and only the amounts specified in such notice to the Trustee shall be paid to the holders of Senior Indebtedness.

Section 15.03     Liquidation; Dissolution; Bankruptcy.

Upon any payment by the Company or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to creditors upon any dissolution,

55

NY1 5435411v4

Page 122

Exhibit 1
Page 4

Case 9:10-bk-14677-RR    Doc 85    Filed 09/07/11    Entered 09/07/11 17:24:45    Desc
Case 9:10-bk-14677-RR    Doc 32-6    Filed 08/24/11    Page 19 of 34  Entered 08/24/11 16:36:23    Desc
Exhibit B (Part 4 of 8)    Page 16 of 24

Harrington West Financial Group, Inc.
as Issuer

INDENTURE
Dated as of September 27, 2004

WELLS FARGO BANK, NATIONAL ASSOCIATION
As Trustee

JUNIOR SUBORDINATED DEBT SECURITIES

Due October 7, 2034

(8) Austin\142935

ARTICLE XV

SUBORDINATION OF DEBT SECURITIES

SECTION 15.01. Agreement to Subordinate.

The Company covenants and agrees, and each holder of Debt Securities issued hereunder and under any supplemental indenture (the "Additional Provisions") by such Securityholder's acceptance thereof likewise covenants and agrees, that all Debt Securities shall be issued subject to the provisions of this Article XV; and each holder of a Debt Security, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provisions.

The payment by the Company of the payments due on all Debt Securities issued hereunder and under any Additional Provisions shall, to the extent and in the manner hereinafter set forth, be subordinated and junior in right of payment to the prior payment in full of all Senior Indebtedness of the Company, whether outstanding at the date of this Indenture or thereafter incurred.

For the avoidance of doubt, the Debt Securities shall rank *pari passu* in right of payment with the Floating Rate Junior Subordinated Debt Securities due October 8, 2033 issued pursuant to an indenture dated September 25, 2003 by and between the Company and Wilmington Trust Company, trustee.

No provision of this Article XV shall prevent the occurrence of any Default or Event of Default hereunder.

SECTION 15.02. Default on Senior Indebtedness.

In the event and during the continuation of any default by the Company in the payment of principal, premium, interest or any other payment due on any Senior Indebtedness of the Company following any applicable grace period, or in the event that the maturity of any Senior Indebtedness of the Company has been accelerated because of a default, and such acceleration has not been rescinded or canceled and such Senior Indebtedness has not been paid in full, then, in either case, no payment shall be made by the Company with respect to the payments due on the Debt Securities.

In the event that, notwithstanding the foregoing, any payment shall be received by the Trustee when such payment is prohibited by the preceding paragraph of this Section 15.02, such payment shall, subject to Section 15.06, be held in trust for the benefit of, and shall be paid over or delivered to, the holders of Senior Indebtedness or their respective representatives, or to the trustee or trustees under any indenture pursuant to which any of such Senior Indebtedness may have been issued, as their respective interests may appear, but only to the extent that the holders of the Senior Indebtedness (or their representative or representatives or a trustee) notify the Trustee in writing within 90 days of such payment of the amounts then due and owing on the Senior Indebtedness and only the amounts specified in such notice to the Trustee shall be paid to the holders of Senior Indebtedness.

-58-

Exhibit 2

Case 9:10-bk-14677-RR    Doc 85    Filed 09/07/11    Entered 09/07/11 17:24:45    Desc
Case 9:10-bk-14677-RR    Main Document    Page 22 of 34 8/24/11    Entered 08/24/11 16:36:23    Desc
Exhibit B (Part 1 of 8)    Page 2 of 19

HARRINGTON WEST FINANCIAL GROUP, INC.

as Issuer

INDENTURE

Dated as of September 25, 2003

WILMINGTON TRUST COMPANY

as Trustee

FLOATING RATE JUNIOR SUBORDINATED DEBT SECURITIES DUE 2033

NY1 5435411v4

"Responsible Officer" means, with respect to the Trustee, any officer within the Principal Office of the Trustee with direct responsibility for the administration of the Indenture, including any vice-president, any assistant vice-president, any secretary, any assistant secretary, the treasurer, any assistant treasurer, any trust officer or other officer of the Principal Office of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of that officer's knowledge of and familiarity with the particular subject.

"Securities Act" means the Securities Act of 1933, as amended.

"Securityholder," "holder of Debt Securities" or other similar terms, means any Person in whose name at the time a particular Debt Security is registered on the Debt Security Register.

"Senior Indebtedness" means, with respect to the Company, (i) the principal, premium, if any, and interest in respect of (A) indebtedness of the Company for money borrowed and (B) indebtedness evidenced by securities, debentures, notes, bonds or other similar instruments issued by the Company, (ii) all capital lease obligations of the Company, (iii) all obligations of the Company issued or assumed as the deferred purchase price of property, all conditional sale obligations of the Company and all obligations of the Company under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business), (iv) all obligations of the Company for the reimbursement of any letter of credit, any banker's acceptance, any security purchase facility, any repurchase agreement or similar arrangement, any interest rate swap, any other hedging arrangement, any obligation under options or any similar credit or other transaction, (v) all obligations of the type referred to in clauses (i) through (iv) above of other Persons for the payment of which the Company is responsible or liable as obligor, guarantor or otherwise and (vi) all obligations of the type referred to in clauses (i) through (v) above of other Persons secured by any lien on any property or asset of the Company (whether or not such obligation is assumed by the Company), whether incurred on or prior to the date of this Indenture or thereafter incurred, unless, with the prior approval of the OTS if not otherwise generally approved, it is provided in the instrument creating or evidencing the same or pursuant to which the same is outstanding that such obligations are not superior or are *pari passu* in right of payment to the Debt Securities; provided, however, that Senior Indebtedness shall not include (A) any debt securities issued to any trust other than the Trust (or a trustee of such trust) that is a financing vehicle of the Company (a "financing entity"), in connection with the issuance by such financing entity of equity or other securities in transactions substantially similar in structure to the transactions contemplated hereunder and in the Declaration or (B) any guarantees of the Company in respect of the equity or other securities of any financing entity referred to in clause (A) above.

"Special Event" means any of a Tax Event, an Investment Company Event or a Capital Treatment Event.

"Special Redemption Date" has the meaning set forth in Section 10.02.

6

NY1 5435411v4

Case 9:10-bk-14677-RR    Doc 85    Filed 09/07/11    Entered 09/07/11 17:24:45    Desc
Case 9:10-bk-14677-RR    Doc 32  Document 08/24/Page 24 of 34 08/24/11 16:36:23    Desc
Exhibit B (Part 4 of 8)    Page 16 of 24

Harrington West Financial Group, Inc.
as Issuer

INDENTURE
Dated as of September 27, 2004

WELLS FARGO BANK, NATIONAL ASSOCIATION
As Trustee

JUNIOR SUBORDINATED DEBT SECURITIES

Due October 7, 2034

(8) Austin\142935

under Section 2.06 in lieu of a lost, destroyed or stolen Debt Security shall be deemed to evidence the same debt as the lost, destroyed or stolen Debt Security.

"Principal Office of the Trustee" means the office of the Trustee, at which at any particular time its corporate trust business shall be principally administered, which at all times shall be located within the United States and at the time of the execution of this Indenture shall be 919 Market Street, Suite 700, Wilmington, DE 19801.

"Redemption Date" has the meaning set forth in Section 10.01.

"Redemption Price" means 100% of the principal amount of the Debt Securities being redeemed plus accrued and unpaid interest on such Debt Securities to the Redemption Date or, in the case of a redemption due to the occurrence of a Special Event to the Special Redemption Date if such Special Redemption Date is on or after October 7, 2009.

"Responsible Officer" means, with respect to the Trustee, any officer within the Principal Office of the Trustee with direct responsibility for the administration of the Indenture, including any vice-president, any assistant vice-president, any secretary, any assistant secretary, the treasurer, any assistant treasurer, any trust officer or other officer of the Principal Office of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of that officer's knowledge of and familiarity with the particular subject.

"Securityholder," "holder of Debt Securities" or other similar terms, means any Person in whose name at the time a particular Debt Security is registered on the Debt Security Register.

"Senior Indebtedness" means, with respect to the Company, (i) the principal, premium, if any, and interest in respect of (A) indebtedness of the Company for money borrowed and (B) indebtedness evidenced by securities, debentures, notes, bonds or other similar instruments issued by the Company; (ii) all capital lease obligations of the Company; (iii) all obligations of the Company issued or assumed as the deferred purchase price of property, all conditional sale obligations of the Company and all obligations of the Company under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business); (iv) all obligations of the Company for the reimbursement of any letter of credit, any banker's acceptance, any security purchase facility, any repurchase agreement or similar arrangement, any interest rate swap, any other hedging arrangement, any obligation under options or any similar credit or other transaction; (v) all obligations of the type referred to in clauses (i) through (iv) above of other Persons for the payment of which the Company is responsible or liable as obligor, guarantor or otherwise; and (vi) all obligations of the type referred to in clauses (i) through (v) above of other Persons secured by any lien on any property or asset of the Company (whether or not such obligation is assumed by the Company), whether incurred on or prior to the date of this Indenture or thereafter incurred, unless (1) with the prior approval of the Federal Reserve or OTS, as applicable, if not otherwise generally approved, in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is provided that such obligations are not superior or are *pari passu* in right of payment to the Debt

Exhibit 2
Page 10

Securities; or (2) the Federal Reserve or OTS, as applicable, shall hereafter classify or otherwise recognize any such obligation as *pari passu* or subordinate to the Debt Securities.

"Special Event" means any of a Tax Event, an Investment Company Event or a Capital Treatment Event.

"Special Redemption Date" has the meaning set forth in Section 10.02.

"Special Redemption Price" means (1) if the Special Redemption Date is before October 7, 2009, One Hundred Percent (100%) of the principal amount of the Debt Securities to be redeemed plus any accrued and unpaid interest thereon to the date of such redemption or (2) if the Special Redemption Date is on or after October 7, 2009, the Redemption Price for such Special Redemption Date.

"Subsidiary" means, with respect to any Person, (i) any corporation, at least a majority of the outstanding voting stock of which is owned, directly or indirectly, by such Person or by one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries, (ii) any general partnership, joint venture or similar entity, at least a majority of the outstanding partnership or similar interests of which shall at the time be owned by such Person, or by one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries, and (iii) any limited partnership of which such Person or any of its Subsidiaries is a general partner. For the purposes of this definition, "voting stock" means shares, interests, participations or other equivalents in the equity interest (however designated) in such Person having ordinary voting power for the election of a majority of the directors (or the equivalent) of such Person, other than shares, interests, participations or other equivalents having such power only by reason of the occurrence of a contingency.

"Tax Event" means the receipt by the Company and the Trust of an Opinion of Counsel experienced in such matters to the effect that, as a result of any amendment to or change (including any announced prospective change) in the laws or any regulations thereunder of the United States or any political subdivision or taxing authority thereof or therein, or as a result of any official administrative pronouncement (including any private letter ruling, technical advice memorandum, regulatory procedure, notice or announcement (an "Administrative Action")) or judicial decision interpreting or applying such laws or regulations, regardless of whether such Administrative Action or judicial decision is issued to or in connection with a proceeding involving the Company or the Trust and whether or not subject to review or appeal, which amendment, clarification, change, Administrative Action or decision is enacted, promulgated or announced, in each case on or after the date of original issuance of the Debt Securities, there is more than an insubstantial risk that: (i) the Trust is, or will be within 90 days of the date of such opinion, subject to United States federal income tax with respect to income received or accrued on the Debt Securities; (ii) interest payable by the Company on the Debt Securities is not, or within 90 days of the date of such opinion, will not be, deductible by the Company, in whole or in part, for United States federal income tax purposes; or (iii) the Trust is, or will be within 90 days of the date of such opinion, subject to or otherwise required to pay, or required to withhold from distributions to holders of Trust Securities, more than a de minimis amount of other taxes (including withholding taxes), duties, assessments or other governmental charges.

-7-

Exhibit 3

Federal Register / Vol. 63, No. 225 / Monday, November 23, 1998 / Notices          64757

## DEPARTMENT OF THE TREASURY

### Office of the Comptroller of the Currency

[Docket No. 98–17]

## FEDERAL RESERVE SYSTEM

[Docket No. R–1022]

## FEDERAL DEPOSIT INSURANCE CORPORATION

## DEPARTMENT OF THE TREASURY

### Office of Thrift Supervision

[Docket No. 98–93]

### Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure

**AGENCIES:** Office of the Comptroller of the Currency, Treasury; Board of Governors of the Federal Reserve System; Federal Deposit Insurance Corporation; and Office of Thrift Supervision, Treasury.

**ACTION:** Notice of interagency policy statement.

**SUMMARY:** The Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System (Board), the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision (OTS) (collectively, the Agencies) are adopting a uniform interagency policy statement regarding intercompany tax allocation agreements for banking organizations and savings associations (institutions) that file an income tax return as members of a consolidated group. The intent of this interagency policy statement is to provide guidance to institutions regarding the allocation and payment of taxes among a holding company and its depository institution subsidiaries. In general, intercorporate tax settlements between an institution and its parent company should be conducted in a manner that is no less favorable to the institution than if it were a separate taxpayer. This policy statement is the result of the Agencies' ongoing effort to implement section 303 of the Riegle Community Development and Regulatory Improvement Act of 1994 (CDRI Act), which requires the Agencies to work jointly to make uniform their regulations and guidelines implementing common statutory or supervisory policies.

**DATES:** This interagency policy statement is effective November 23, 1998.

**FOR FURTHER INFORMATION CONTACT:**
*OCC:* Gene Green, Deputy Chief

Accountant, (202/874–4933), or Tom Rees, Senior Accountant, (202/874–5411), Office of the Chief Accountant, Core Policy Division, Office of the Comptroller of the Currency, 250 E Street, SW, Washington, DC 20219.

*Board:* Charles Holm, Manager, (202/452–3502), or Arthur Lindo, Supervisory Financial Analyst, (202/452–2695), Division of Banking Supervision and Regulation, Board of Governors of the Federal Reserve System, 20th and C Streets, NW, Washington, DC 20551. For the hearing impaired only, Telecommunication Device for the Deaf (TDD), Diane Jenkins (202/452–3544).

*FDIC:* For supervisory issues, Robert F. Storch, Chief, (202/898–8906), or Carol L. Liquori, Examination Specialist, (202/898–7289), Accounting Section, Division of Supervision; for legal issues, Jamey Basham, Counsel, (202/898–7265), Legal Division, FDIC, 550 17th Street, NW, Washington, DC 20429.

*OTS:* Timothy J. Stier, Chief Accountant, (202/906–5699), or Christine Smith, Capital and Accounting Policy Analyst, (202/906–5740), Accounting Policy Division, Office of Thrift Supervision, 1700 G Street, NW, Washington, DC 20552.

**SUPPLEMENTARY INFORMATION:**

## I. Background

Section 303(a)(3) of the of the CDRI Act directs the Agencies, consistent with the principles of safety and soundness, statutory law and policy, and the public interest, to work jointly to make uniform regulations and guidelines implementing common statutory or supervisory policies. Section 303(a)(1) of the CDRI Act also requires the Agencies to review their regulations and written policies and to streamline those regulations where possible.

In 1978, the FDIC, the OCC, and the Board each published a separate policy statement regarding the allocation and payment of income taxes by depository institutions which are members of a group filing a consolidated income tax return. The OTS provides supervisory guidance on this subject in its Holding Company Handbook. As part of the ongoing effort to fulfill the section 303 mandate, the Agencies have reviewed, both internally and on an interagency basis, the present policy statements and the supervisory guidance that has developed over the years. As a result of this review, the Agencies identified minor inconsistencies in the policy statements and supervisory guidance. Although largely limited to differences in language and not to the substance of

the policies and guidelines themselves, the Agencies determined that it would be beneficial to adopt a uniform interagency policy statement regarding intercorporate tax allocation in a holding company structure.

## II. Policy Statement

This interagency policy statement reiterates and clarifies the position the Agencies will take as they carry out their supervisory responsibilities for institutions regarding the allocation and payment of income taxes by institutions that are members of a group filing a consolidated return. The interagency policy statement reaffirms that intercorporate tax settlements between an institution and the consolidated group should result in no less favorable treatment to the institution than if it had filed its income tax return as a separate entity. Accordingly, tax remittances from a subsidiary institution to its parent for its current tax expense should not exceed the amount the institution would have paid had it filed separately. The payments by the subsidiary to the parent generally should not be made before the subsidiary would have been obligated to pay the taxing authority had it filed as a separate entity. Similarly, an institution incurring a tax loss should receive a refund from its parent. The refund should be in an amount no less than the amount the institution would have received as a separate entity, regardless of whether the consolidated group is receiving a refund. However, adjustments for statutory tax considerations which may arise in a consolidated return are permitted as long as the adjustments are made on a basis that is equitable and consistently applied among the holding company affiliates. Regardless of the method used to settle intercorporate income tax obligations, when depository institution members prepare regulatory reports, they must provide for current and deferred income taxes in amounts that would be reflected as if the institution had filed on a separate entity basis.

An institution should not pay its deferred tax liabilities or the deferred portion of its applicable income taxes to its parent since these are not liabilities required to be paid in the current reporting period. Similarly, transactions in which a parent "forgives" any portion of a subsidiary institution's deferred tax liability should not be reflected in the institution's regulatory reports. This is because a parent cannot relieve its subsidiary of this potential future obligation to the taxing authorities, since these authorities can collect some or all of a group liability

1    RODGER M. LANDAU (State Bar No. 151456)
     SHARON M. KOPMAN (State Bar No. 164449)
2    LANDAU GOTTFRIED & BERGER LLP
     1801 Century Park East, Suite 1460
3    Los Angeles, California  90067
     Telephone: (310) 557-0050
4    Facsimile: (310) 557-0056
     rlandau@lgbfirm.com
5    skopman@lgbfirm.com

6    Counsel for Debtor and Debtor In
     Possession

7

                     UNITED STATES BANKRUPTCY COURT
8
                FOR THE CENTRAL DISTRICT OF CALIFORNIA
9
                            NORTHERN DIVISION
10

11

12   In re                              Bk. No.  9:10-bk-14677-RR

13   HARRINGTON WEST FINANCIAL GROUP,    Chapter 11
     INC.,
14                                       DEBTOR HARRINGTON WEST
                 Debtor and Debtor In    FINANCIAL GROUP, INC.'S STATUS
15               Possession.             REPORT REGARDING SOLICITATION
                                         AND CONFIRMATION OF DEBTOR'S
16                                       FIRST AMENDED PLAN OF LIQUIDATION
                                         AND RESPONSE TO THE FEDERAL
17                                       DEPOSIT INSURANCE CORPORATION'S
                                         OBJECTION;  DECLARATIONS OF KERRY
18                                       STEELE AND SHARON M. KOPMAN IN
                                         SUPPORT THEREOF
19

20                                       Confirmation Hearing:

21
                                         Date:    September 14, 2011
22                                       Time:    11:00 a.m.
                                         Place:   Courtroom 201
23                                                1415 State Street
                                                  Santa Barbara, CA 93101-2511
24

25

26

27

28

LANDAU
GOTTFRIED &
BERGER LLP

1    **TO THE HONORABLE ROBIN L. RIBLET, UNITED STATES BANKRUPTCY JUDGE**

2    **AND ALL INTERESTED PARTIES:**

3        Debtor and Debtor in Possession Harrington West Financial Group, Inc. ("Debtor") submits

4    this pleading (the "Response") (a) as a status report on the outcome of Debtor's solicitation efforts

5    on its First Amended Plan of Reorganization ("Plan"); (b) to advise the Court on the current status of

6    Debtor's negotiations with creditors and the Debtor's position regarding proposed next steps in this

7    Bankruptcy Case; and (c) to respond to the objection to the Plan ("Objection") filed by the Federal

8    Depository Insurance Corporation ("FDIC-R") as receiver of Los Padres Bank, FSB (the "Bank").[1]

9    The Debtor has also filed a Plan Ballot Summary as required by Local Bankruptcy Rule 3018-1.

10   (Docket No. 86).

11   **STATUS REPORT ON SOLICITATION PROCESS**

12       The Debtor is disappointed to inform the Court that it does not have a confirmable Plan as of

13   the date this Response is filed. There were two impaired classes of claims in the Plan that were

14   entitled to vote:  Class 3 and Class 4.  As reflected in the Plan Ballot Summary, in Class 3, only two

15   creditors voted on the Plan.  One creditor, American Stock Transfer Company, voted to accept the

16   Plan.  The other, the FDIC-R, which was allowed to vote $1.00 due to the contingent, unliquidated

17   nature of its claim, voted to reject the Plan.

18       The Debtor was blind-sided by the FDIC-R Objection and rejection of the Plan.  Until such

19   Objection was filed, the Debtor believed that Class 3 would be an impaired consenting class and that

20   if necessary, the Plan could be confirmed under § 1129(b) of the Bankruptcy Code if Class 4 rejected

21   the Plan or failed to vote.  The FDIC-R's counsel notified the Debtor's counsel on the August 24,

22   2011 Voting Deadline and Objection Deadline that it had been instructed by its client to file an

23   Objection and to reject the Plan. *See* Exhibit "4" attached to the Declaration of Sharon M. Kopman

24   ("Kopman Declaration") annexed hereto and filed in support of this Response.  The issues in the

25   FDIC Objection were not previously raised with the Debtor.  The Debtor had believed that, because

26   it had already made revisions to the Disclosure Statement and Plan requested by the FDIC-R in

27   connection with the Disclosure Statement Hearing (as reflected on the record of the Disclosure

28

---

[1]        Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

1   Statement Hearing) and in the Supplement filed in support of Debtor's Disclosure Statement (Docket

2   No. 61), the FDIC-R was content with the Plan. *See* Declaration of Kerry Steele ("Steele

3   Declaration") annexed hereto and filed in support of this Response.

4          With respect to Class 4, only one creditor voted and that creditor voted to reject the Plan. *See*

5   Plan Ballot Summary. The other owners of trust originated preferred securities ("TRUPs") in Class 4

6   that were entitled to vote elected not to submit ballots.  The rejection by the TRUP holder that did

7   vote, Holdco Advisors L.P., as manager for Tricadia CDO Management, LLC, Financials

8   Restructuring Partners, Ltd., Financials Restructuring Partners II, Ltd., and Tricadia Financials

9   Restructuring Partners, Ltd. ("Holdco"), was not a surprise because the Debtor has been

10  communicating with Holdco and its counsel, Duane Morris, LLP, over the last few months and

11  understands that Holdco is interested in filing its own plan. *See* Steele Declaration.  Holdco has

12  indicated to the Debtor that Holdco's proposed plan would be an equitization plan, one that Holdco

13  claims would potentially bring additional assets into the Estate for the benefit of creditors.  The

14  Debtor has advised Holdco that it would be willing to review and consider any plan that it files but

15  such filing must be done quickly.  Conceptually, the equitization plan Holdco proposes sounds

16  confirmable; however, the Debtor cannot take a position until it reviews such plan as filed.

17                      **CURRENT STATUS OF NEGOTIATIONS/NEXT STEPS**

18          The Debtor has made every effort to march forward and administer its case as quickly and

19  efficiently as possible.  Approximately one (1) year has passed since the Petition Date (September

20  10, 2010).  The Debtor still believes its liquidating Plan is in the best interests of the Debtor's Estate

21  and all its creditors.  However, the FDIC-R and Holdco are fighting over their own respective issues

22  and have their own agendas. *See* Steele Declaration.  If the Debtor is able to reach a consensual

23  resolution such that the Plan becomes confirmable, the Debtor reserves all of its rights to file further

24  evidence and pleadings in support of its Plan, as may be amended from time to time.

25          The Debtor has been and is continuing to attempt to consensually resolve issues with the

26  FDIC-R as reflected in the response to the FDIC-R Objection below.  The Debtor believes all the

27  proposed changes to address the FDIC-R Objection are non-material changes to the existing Plan.

28  As of the filing of this Response, the FDIC-R is unwilling to negotiate and has advised the Debtor

LANDAU
GOTTFRIED &
BERGER LLP                                            3

1    that it will likely seek conversion of the Bankruptcy Case to a Chapter 7. *See* Steele Declaration.

2    The Debtor has also been communicating with Holdco and its counsel. The Debtor has

3    advised Holdco that if it (a) supports the current Plan and changes its vote or (b) *immediately* files its

4    Plan, and the Debtor views the filed Plan as confirmable, the Debtor may support a brief continuance

5    if requested by Class 4. With respect to (b), the Debtor is willing to support a confirmation hearing

6    on a shortened timeline, as approved by the Bankruptcy Court, and to facilitate the process as much

7    as possible. The Debtor believes the proposed Holdco Plan that Holdco has shared with the Debtor

8    would be preferable to a conversion if such Plan is promptly filed since if the Bankruptcy Case were

9    converted now, much of the momentum and institutional knowledge relating to the matters at issue

10   in this case would be lost, to the detriment of creditors.

11   Accordingly, the Debtor's position is as follows: If the Debtor can confirm the current Plan

12   by reaching a deal with the FDIC-R or Class 4 and a brief continuance is necessary to confirm the

13   Plan, the Debtor would support a continuance if the Court is willing to grant such request. If Class 4

14   files a confirmable plan by September 14th and requests a continuance, the Debtor likely would

15   support that as well.[2] If no one comes to the table on the current Plan and Class 4 continues to seek

16   a continuance without filing a plan, the Debtor sees no purpose in continuing the case merely in the

17   hope that things will change.

18   Administrative Expenses continue to accrue daily and the Debtor's Cash Flow Projection

19   reflects approximately $100,000 in Cash available as of the proposed Effective Date of its Plan

20   (September 2011). *See* Exhibit "3" to the Plan Supplement (Docket No. 75). The Debtor is solely

21   interested in taking a course of action that is in the best interests of the Debtor and its creditors, and

22   if no confirmable chapter 11 plan emerges promptly, continued delay would only occasion an

23   unnecessary expenditure of the Estate's limited resources, and would not best serve those interests.

24   If conversion is the only viable option, the Debtor would request that the Court allow interim fee

25   applications to be filed to pay the Chapter 11 administrative expenses *pro rata* such that $100,000

26   remains in the Estate for the Chapter 7 trustee to use to administer the case. This is the same amount

27   _____

28   [2]    The Debtor would request that Holdco be required to keep a tight timeline to solicit and seek confirmation of such a plan.

LANDAU
GOTTFRIED &
BERGER LLP

1    of funds that would have been available to the Liquidating Trustee if the Debtor's Plan were

2    confirmed.  *See* Steele Declaration.

3    ## RESPONSE TO FDIC OBJECTION

4         With respect to the FDIC Objection, the Debtor responds as follows:

5         1)    <u>FDIC-R DOES NOT HAVE A SENIOR CLAIM</u>:  Why the FDIC-R waited until now

6    to raise this argument with the Debtor is mystifying in light of the Debtor's demonstrated

7    willingness to engage with the FDIC-R in the plan process, and to address the FDIC-R's concerns

8    when raised.  For the first time in this case, the FDIC-R argues in its Objection that some portion of

9    its Class 3 claim – mainly as it relates to the approximately $9 million dollar Tax Refund sought

10   from the Internal Revenue Service - is senior to the Holders of Claims in Class 4 (the TRUP

11   holders).  The FDIC-R bases its argument  on section 15.01 in the Indentures, which provides that

12   debt under the Indentures is subordinated to "Senior Indebtedness" as defined in the Indentures.  *See*

13   <u>Exhibit "1"</u> to the Kopman Declaration (Section 15.01 in the Indentures).  The problem is that the

14   FDIC-R has failed to produce any evidence supporting its claim that it is "<u>Senior Indebtedness</u>,"

15   which is defined in the Indentures as follows:

16            [M]eans with respect to the [Debtor]  (i) the principal, premium, if any,

17            and interest in respect of (A) indebtedness of the [Debtor] for money

18            borrowed and (B) indebtedness evidenced by securities, debentures,

19            notes, bonds or other similar instruments issued by the [Debtor], (ii) all

20            capital lease obligations of the [Debtor], (iii) all obligations of the

21            [Debtor] issued or assumed as the deferred purchase price of property,

22            all conditional sale obligations of the [Debtor] and all obligations of the

23            [Debtor] under any title retention agreement (but excluding trade

24            accounts payable arising in the ordinary course of business). . . . .

25   *See* <u>Exhibit "2"</u> to the Kopman Declaration (the "definition of "Senior Indebtedness" in the

26   Indentures).  The list goes on with examples of the typical secured creditor.

27        The Debtor has not borrowed funds from its wholly-owned subsidiary, the Bank, but to the

28   contrary, as reflected in the Debtor's Disclosure Statement, the Debtor down-streamed most, if not

1   all, the funds it raised to the Bank to keep the Bank adequately capitalized. (DS Section III A-C, pp.

2   11-20). *No loan agreement or other documentation evidencing any loan from the Bank to the*

3   *Debtor exists.* Instead, the FDIC-R relies on an argument that treatment of whatever claim it may

4   have to the Tax Refund as a loan is compelled by an *Interagency Policy Statement on Income Tax*

5   *Allocation in a Holding Company Structure,* issued by the Office of the Comptroller of the

6   Currency, the Board of Governors of the Federal Reserve System, the FDIC and the Office of Thrift

7   Supervision, effective November 23, 1998 (the "Policy Statement"), a copy of which is appended as

8   Exhibit "C" to the Declaration of John Kim filed in support of the FDIC-R Objection. That reliance,

9   however, is entirely misplaced.

10      The FDIC-R's reliance on the Policy Statement to characterize the relationship between the

11  Debtor, Holders of Class 4 Claims, and the FDIC-R for bankruptcy purposes erroneously expands

12  the Policy Statement vastly beyond its stated scope. By its terms, the Policy Statement is intended

13  solely to provide guidance as to how the agencies involved will carry out their oversight functions,

14  not to provide a basis for subordinating third party claims. Section II of the Policy Statement

15  explicitly defines that scope, providing that "[t]his *interagency policy statement* reiterates and

16  clarifies the position *the Agencies will take as they carry out their supervisory responsibilities.*"

17  Policy Statement, page 64757 (emphasis added). It thus has absolutely nothing to do with how third

18  party claims – such as those of the TRUP Holders in Class 4 – are to be treated in this bankruptcy

19  case, and the FDIC-R's arguments to the contrary are without merit. *See* Exhibit "3" to the Kopman

20  Declaration (text of the Policy Statement highlighted for the Court).

21      This understanding of the limited regulatory nature of the Policy Statement is confirmed by

22  the fact that such Policy Statement does not mandate treatment of tax transactions between parents

23  (such as the Debtor) and bank subsidiaries as loans, but rather provides guidance that the regulators

24  "may" "consider" certain tax transactions to be "extensions of credit" that "may be subject to

25  affiliate transaction rules, i.e. Sections 23A and 23B of the Federal Reserve Act." Policy Statement,

26  page 64758.

27      Moreover, the Policy Statement is precisely that – a policy statement of an agency. As such

28  it is not law. The United States Supreme Court, rejecting a similar argument that legal reliance